[No. A123926. First Dist., Div. Two. Sept. 20, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS PANIAGUA, Defendant and Appellant.

500

## COUNSEL

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Seth K. Schalit, Bridget Billeter and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RICHMAN, J.**—Defendant Carlos Paniagua appeals from the order committing him to the State Department of Mental Health for an indeterminate term, which order followed a jury's determination that defendant qualified as a sexually violent predator (SVP)—a determination made after three days of deliberation. Defendant makes seven arguments on appeal. The first claims the petition for his commitment was procedurally defective. The next four claim evidentiary and instructional error. And the final two claim the amended version of the SVP commitment scheme (Welf. & Inst. Code, § 6600

et seq.)[1] that extended the length of commitment from two years to an indeterminate term is unconstitutional, on two separate bases.

We reject defendant's procedural argument. But we agree with one of his evidentiary arguments, that the trial court committed prejudicial error in admitting evidence that defendant returned from Thailand on United Airlines flight No. 842. The evidence had been the subject of a motion in limine, and vigorous dispute, and was admitted over defendant's Evidence Code section 352 objection—without any section 352 analysis. And even after the true facts revealed, as the People stipulated, that United Airlines did not have such a flight, the evidence remained and was argued. We thus reverse, with no need to reach defendant's constitutional challenges.

## BACKGROUND

In 1998, 15 years after a warrant was issued for his arrest, defendant surrendered to face 120 counts of sodomizing and molesting two boys under the age of 14. After pleading guilty to one count of each of these types of offenses, defendant was sentenced to state prison for a term of eight years, this sentence being concurrent to one from Los Angeles.[2]

Defendant's scheduled release date from California's Department of Corrections (CDC) (before its name was changed to Department of Corrections and Rehabilitation) was December 24, 2002. Prior to his scheduled release, defendant was evaluated by a State Department of Mental Health (DMH) psychologist and identified as a potential SVP. Pursuant to section 6601.3, defendant's release date was extended by the Board of Prison Terms (Board) for 45 days, that is, until February 6, 2003.[3] However, it was not until February 11 that the District Attorney of San Francisco filed a "Petition For Involuntary Commitment As Sexually Violent Predator," and defendant was

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The disposition of the Los Angeles matter, covering offenses that occurred in 1986, was described in the probation report as follows: "Defendant pled guilty to 288(a) PC (Lewd and Lascivious Act on Child Under 14) and 273(a)(1) PC (Willful cruelty to Child in Defendant's Possession Causing Injury)—sentenced to 8 years State Prison . . . 11/20/98: Received at C.D.C."

[3] "Upon a showing of good cause, the Board of Parole Hearings may order that a person referred to the State Department of State Hospitals pursuant to . . . Section 6601 remain in custody for no more than 45 days beyond the person's scheduled release date . . . ." (§ 6601.3, subd. (a).) Section 6601 sets out the process whereby a state prison inmate may be evaluated and "screened" "to determine whether the person is a sexually violent predator . . . ." (§ 6601, subds. (a)–(c).)

ordered "detained in a secure facility until a formal probable cause hearing pursuant to . . . Section 6602 is conducted . . . ."[4]

That hearing was originally set for February 10, 2003, but with defendant's acquiescence it was repeatedly continued until 2003 had passed. The hearing began on January 30, 2004, resumed on April 23, and concluded on September 10, 2004. After listening to almost 230 pages of testimony and argument, the court ruled that good cause under section 6601 (see fn. 3, *ante*) had been shown.

The district attorney's first attempt to have defendant declared an SVP ended with a mistrial in September 2006.

The second trial, that involved here, began on July 17, 2008. As is common in SVP trials, defendant did not testify, and both sides relied primarily on the testimony of expert witnesses. There being no genuine dispute about the underlying crimes, the primary point of contention between the experts was whether defendant was likely to pose a danger to the safety of others because he was a sexually violent predator. And how defendant scored on the STATIC-99 test[5] was central to each expert's diagnosis. The prosecution's case relied on two experts, Dr. Dawn Starr and Dr. Kathleen Longwell, both of whom testified that defendant's score of 6 on that test placed him in the high-risk-to-reoffend category. Defendant presented three experts, Drs. Howard Barbaree, Brian Abbott, and Theodore Donaldson, each of whom scored or would score defendant at 3, and thus significantly less likely to reoffend. A significant factor for the lower score was defendant's age—64 at the time of trial—and there was an issue whether a reduction for that fact was scientifically reliable.

Yet this was only the tip of the iceberg. The experts' disagreement was virtually total.[6] They drew different conclusions as to, among other things,

---

[4] "A judge of the superior court shall review the petition and shall determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).)

[5] "The Static-99 test is an actuarial instrument that allows an evaluator to place sexual offenders in different risk categories based on historical (static) factors such as age, marital status, the number of prior offenses, the relationship of the offender to the victims and the gender of the victims. After identifying the particular characteristics of the offender, the Static-99 test assigns a numeric score to them. The total score of the test is a percentage chance of the defendant's likelihood of being convicted for a future sexual offense." (*People v. Therrian* (2003) 113 Cal.App.4th 609, 612 [6 Cal.Rptr.3d 415].) Psychologists and psychiatrists employed by the state to make SVP evaluations are required to use it. (See Pen. Code, § 290.04.)

[6] And it was perhaps tinged with the personal. Dr. Barbaree went right to the edge of accusing Dr. Longwell of distorting the STATIC-99 principles because of bias against

whether defendant had pedophilia, whether he had a narcissistic personality, and whether he had a primarily heterosexual orientation and thus was merely a "situational" or "opportunistic" molester. An enormous amount of time was occupied with the methodology of the tests used by the experts.

On August 26, after three full days of deliberations,[7] the jury returned a verdict that defendant was an SVP, whereupon the trial court committed him to a state hospital. Defendant filed his notice of appeal two days later.

## DISCUSSION

### The Petition Was Not Jurisdictionally Defective

Defendant's first contention is based on missed deadlines. He argues: "The petition seeking to commit appellant as an SVP was not timely filed. The petition was filed on February 11, 2003. Appellant's CDC release date was December 24, 2002. The Board of Prison Terms did not grant a 45-day extension until December 30, 2002. Further, this 45-day extension was not supported by good cause. Therefore, the order does not excuse the late filing of the petition. However, even if the 45-day extension was valid, the extension expired at midnight, February 6, 2003. Therefore, the trial court lacked jurisdiction to proceed . . . ."

This record does not show the Board in the best light. The Attorney General expressly or implicitly concedes most of defendant's arguments, namely that (1) defendant's release date was December 24, 2002; (2) the 45-day extension was not declared until December 30, six days after defendant's release date; and (3) the 45-day extension would expire on February 6, 2003.

As already mentioned, section 6601.3 (quoted at fn. 3, *ante*) allows the Board to put a 45-day "hold" on a person upon a showing of "good cause." The statute now has a definition of "good cause," but that definition was not added until after all proceedings in the trial court had been concluded. (Stats. 2010, ch. 710, § 5.) Prior to this amendment of section 6601.3, the only definition of what constituted "good cause" was in a regulation.[8] During the pendency of this appeal, our Supreme Court held that

---

defendant, and Dr. Abbott as much as testified that Dr. Longwell did not know how to properly apply the criteria of the test. Dr. Abbott flat-out accused Dr. Starr of misrepresenting the contents of a professional publication.

[7] The jury began deliberations on the afternoon of August 21, deliberated all day on August 22 and all day on August 25, and finally returned its verdict on the afternoon of August 26.

[8] "[G]ood cause to place a 45-day hold pursuant to Welfare and Institutions Code section 6601.3 exists when either the inmate or parolee in revoked status is found to meet all the following criteria:

this regulation was invalid, but that the Board's reliance on it was in good faith, thus excusing and validating petitions filed after the inmate's scheduled release date. (*In re Lucas* (2012) 53 Cal.4th 839, 844–845 [137 Cal.Rptr.3d 595, 269 P.3d 1160]; see § 6601, subd. (a)(2) ["A petition shall not be dismissed on the basis . . . that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law."].) The parties have filed letter briefs discussing the impact of this decision.

*Lucas* establishes that the mere chronological fact that one or more periods, particularly the 45-day hold period, may have elapsed prior to filing of the petition for commitment does not ipso facto invalidate the petition and require its dismissal. This is consistent with decisions holding that missed SVP Act deadlines are not jurisdictional. (E.g., *In re Smith* (2008) 42 Cal.4th 1251, 1261 [73 Cal.Rptr.3d 469, 178 P.3d 446] [" 'petitions to commit dangerous sex offenders to mental health facilities after their terms have expired cannot be dismissed simply because . . . a prisoner's term was mistakenly extended.' . . . [¶] '. . . sexually violent predators are not to be unleashed on society simply because "the constable has blundered." ' "]; *People v. Taylor* (2009) 174 Cal.App.4th 920, 934 [94 Cal.Rptr.3d 756] ["An individual is not automatically entitled to release upon the expiration of a term of commitment, even if a timely petition to extend the commitment is not filed. [Citations.] In other words, unlawfulness of an individual's custodial status (due to expiration of his or her determinate term or expiration of his or her prior commitment) does not divest the trial court of jurisdiction to proceed on a petition for commitment or recommitment."]; *People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1228–1229 [106 Cal.Rptr.2d 490] ["A number of published cases have rejected the argument that lawful custody was a jurisdictional prerequisite to the filing of an SVPA petition prior to the

"(1) Some evidence that the person committed a sexually violent offense by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person on, before, or after January 1, 1996, which resulted in a conviction or a finding of not guilty by reason of insanity of one or more felony violations of the following Penal Code Sections: 261, 262, 264.1, 269, 286, 288, 288(a), 288.5, 289 or any felony violation of sections 207, 209 or 220, committed with the intent to commit a violation of sections 261, 262, 264.1, 286, 288, 288a, or 289. The preceding felony violations must be against one or more victims.

"If the victim of one of the felony violations listed above is a child under 14, then it is considered a sexually violent offense.

"A prior finding of not guilty by reason of insanity for an offense described in this subdivision, a conviction prior to July 1, 1977 for an offense described in this subdivision, a conviction resulting in a finding that the person was a mentally disordered sex offender, or a conviction in another state for an offense that includes all of the elements of an offense described in this subdivision, shall also be deemed to be a sexually violent offense, even if the offender did not receive a determinate sentence for that prior offense.

"(2) Some evidence that the person is likely to engage in sexually violent predatory criminal behavior." (Cal. Code Regs., tit. 15, § 2600.1, subd. (d).)

amendment of section 6601. [Citations.] We agree with the analysis of those courts."]; *Garcetti v. Superior Court* (1998) 68 Cal.App.4th 1105, 1114 [80 Cal.Rptr.2d 724] ["a determination of *lawful* custody is [not] a jurisdictional prerequisite to the filing of a petition under the SVP Act for civil commitment"].)

Moreover, the Legislature has taken the same view. When it amended section 6601 in 1999 to add the language in subdivision (a)(2) concerning good faith mistake, the Legislature made the following uncodified finding: "The Legislature finds and declares that paragraph (2) of subdivision (a) of Section 6601 is declaratory of existing law. The Sexually Violent Predator Act authorizes civil commitment of persons who pose a danger as a result of mental disorder if released from custody. Therefore, where a petition for commitment of a sexually violent predator has been filed, *it is not the intent of the Legislature that a person be released based upon a subsequent judicial or administrative finding that . . . a hold placed pursuant to Section 6601.3 . . . was unlawful.*" (Stats. 1999, ch. 136, § 3, p. 1834, italics added.)

In sum, there is a substantial judicial and legislative showing that a missed 45-day hold period is not a "Get out of Jail Free" card. Apart from the regulation found invalid in *Lucas*, there is the amendment of section 6601.3 demonstrating that the concept of well-intentioned but excusably imperfect actions is not to be given a restricted application. And from her discussion of *People v. Hubbart, supra*, 88 Cal.App.4th 1202 and *People v. Superior Court (Whitley)* (1999) 68 Cal.App.4th 1383 [81 Cal.Rptr.2d 189], the Attorney General convincingly shows that the fact that defendant was not released has no talismanic significance because, even if he had been released, an SVP proceeding could still be commenced. (See *In re Smith, supra*, 42 Cal.4th 1251, 1269 ["state [may] proceed against those whose initial prison custody was valid, but who might evade SVP commitment due to erroneous parole revocations or extensions of sentence . . ."].)

The only remaining question on this issue is whether this case comes within the good faith exception established by *Lucas*. Defendant concedes that it does.

## The Trial Court Committed Prejudicial Error in Admitting Evidence of a Possible Trip to Thailand

Defendant's first claim of evidentiary error is that the trial court permitted the prosecution to introduce evidence concerning defendant's "alleged trip to Thailand." We agree, and further agree that the error was prejudicial.

## The Proceedings in the Trial Court

What the evidence was, and how it came to be—and to be disputed—requires a lengthy discussion, which begins with reference to defendant's motion in limine No. 2 filed on July 7, 2008. The motion sought to prohibit (1) "testimony that [defendant] ever visited Thailand after the end of the Vietnam War"; (2) "any inference or insinuation that [defendant ] traveled to a foreign country to have sex, with minors (Thailand, El Salvador or anywhere else)"; and (3) "any prolonged cross-examination on the issue of travel to Thailand during the 70's."

Defendant's motion described the background leading to it, which was that the People had subpoenaed information from the Department of Homeland Security (derived prior to creation of that department), in its effort to show defendant's pattern of travel in and out of the United States, especially as defendant had made statements that from 1993 to 1998 he had traveled to El Salvador. The documents included one that showed defendant arriving in Los Angeles on August 21, 1998, on United Airlines flight No. 842 from Thailand.[9] Defendant's motion argued that he "vociferously and vehemently objects to the information being presented to the evaluators or the jury for consideration, absent additional trustworthiness of this information, as [defendant] has not been to Thailand or anywhere in Asia since the end of the Vietnam War. His passport does not reflect travel to Thailand." The motion then continued: "On the very day this information was received by counsel for [defendant] objections both verbally and by email were immediately made to counsel for [the People] indicating the error in this information provided by the Department of Homeland Security. [¶] Absent additional proof, such as the actual embarkation card filled out by [defendant], and a person from the former Immigration and Customs Department testifying in a 402 and then again in front of the jury after a 402 hearing, if allowed, this information would not be presented to the jury, nor provided to the state evaluators. Allowing this highly controversial and contested evidence in before the jury is tantamount to taking judicial notice of the records provided by the Department of Homeland Security. This is not proper."

Defendant's motion represented that the district attorney wished to present this information for the sole purpose that defendant does not tell the truth, in that he did not mention this during his testimony in the first trial. However, the motion went on, "if allowed before the jury without sanitization the jury will obviously infer that the [defendant] went to Thailand for purposes of illicit sex with minors. Had the records showed the [defendant] went to Paris, this issue might not even come to the attention of the court or jury. There will

---

[9] None of the documents obtained from the government is in the record, and we glean the contents from representations in the arguments and the briefing.

be no evidence in this case that [defendant] engaged in sex with a minor in Thailand, that sex with minors is easily available in Thailand, how long [defendant] was ostensibly in Thailand, whether the [defendant] was in transit when he reached Thailand from another destination, begging the question that [defendant] actually entered the country and set foot out of the Thailand airport. There is no evidence that [defendant] entered Thailand, stayed in Thailand or made contact with any minor in Thailand.

"In addition there are serious discrepancies within the records provided by the Department of Homeland Security that reflect on the records' accuracy. These details will be pointed out at the hearing on this motion.

"Should this court overrule [defendant's] objection and allow testimony regarding travel to another country in 1998, then the name 'Thailand' should be sanitized and referred to as another country so as not to prejudice [defendant] with any hint of impropriety that respondent engaged in sex with a minor or flew to Thailand for that purpose, as it violates Evidence Code 352 and is based wholly and completely on supposition, outright innuendo and meritless assumption.

"If the court is even inclined to let this evidence in before the jury, a 402 motion with the appropriate witnesses should testify to verify that the information recorded on a computer within the Department of Homeland Security is accurate and not subject to error. Should this testimony be allowed to come before the jury with or without the benefit of a hearing, it will cause a mini-trial on the issue of whether [defendant] did or did not enter a foreign country and if he did, entered for purposes of having sex with a minor. It still remains to be seen how this information passes Evidence Code section 352 muster, *and* has any relevance to whether the [defendant], at the time of trial, has a current and active mental disorder coupled with volitional impairment that makes it seriously difficult to control his behavior based on travel for an unknown period of time ten years prior to trial.

"The evidence should be excluded on any of the grounds provided or at the very least sanitized, if after a hearing, the evidence proffered is found by the court to be reliable and trustworthy and more probative than prejudicial."

The record does not contain any indication the People filed opposition to the motion, so we do not know if it took a position in writing. However, we do know its position at the hearing on the motion, which was held on July 14, 2008.

The hearing began with the court stating that counsel for defendant "handed us copies of a printout of an email sent last week." Counsel for

defendant asked if he could "make a record, Your Honor." The court answered "yes," and counsel spoke for three pages, in the course of which he represented the following:

"Mr. Barg [the district attorney] had indicated to me that when he received the information from the Department of Homeland Security that Mr. Paniagua had flown from Trang Airport in Thailand to Los Angeles on United Airlines Flight 842, I communicated that to my client within a matter of probably 15 minutes, and he told me that in absolutely no way did he ever go to Thailand. The only time he had ever been to Thailand was in the—during the Vietnam War. He had not been there since the '70's.

"So I had written to Mr. Barg an email. I also spoke to him on the phone several times about it. And I told him about our vociferous and vehement objections to that document being placed before the jury and in evidence, and requested that he not provide that material to the State evaluators, pending a hearing as to the admissibility of that particular evidence.

"I had requested that he obtain the disembarkation card, that it may be held in microfiche, that Mr. Paniagua would have signed, which would have indicated what flight he was on, what he was carrying, . . . that those forms are required to be filled out every time a passenger enters into the United States, it is stamped by Immigration and is collected by Customs on your way out of the door. I don't know if he followed up on that request.

"In the meantime, I contacted someone from United Airlines in Flight Operations, their Legal Department in Chicago, and Corporate Security in their worldwide headquarters, and I was informed that United Airlines has never flown to Trang Thailand . . . and that flight 842 . . . was a flight from Melbourne to Auckland, Auckland to Los Angeles, and it continued on to Chicago. That is that particular route for that flight number back in . . . August 21, 1998.

"Be that as it may, I have objected to the trustworthiness and the indicia of reliability of this document immediately, as soon as it was served upon us, based upon my good faith belief that it was a problem, and I did everything I could, diligently, in order to show that this entry error by whoever processed the data, was that, was an error.

"In my moving papers, I had asked for not only the custodian of records would have to come and testify to that document, but also a data entry person that would show how this stuff is actually computerized.

"The other problems with the document is that . . . . [t]here is a difference in this particular border crossing document than there are any other documents, and that is it shows the arrival airport as being Los Angeles International on the other three documents. On the document that discusses Flight 842, it says it arrived at Trang Thailand Airport, not LAX. So this information that got inputted by whomever did the inputting, clearly messed this up.

"So I object to the admission of the evidence. I object to the doctors considering it in their opinions that he went to Thailand. There was no evidence that he went to Thailand. There is no proof that he was in Thailand, he ever left the airport and was out in the city. . . .

"So we can't allow for misinterpretations and speculation in this kind of a case. And clearly admission of this particular piece of evidence, either through the admission of the document or testimony of the doctors, should be prohibited by the Court."

The court then turned to the deputy district attorney, and the following colloquy ensued:

"Mr. Barg: Your Honor, we have certified copies sent directly to the Court from the United States Government, U.S. Customs and Border Protection. Each of these documents that the Court has seen shows Mr.——'Border Crossing' on top. 'Personal Information,' it has Mr. Paniagua's name, last name, first name, his birth date, and each and every document has his passport number on it.

"The very fact Mr. Paniagua denies being in Thailand, that's fine. He can deny it. All I have to do is show reliability. I don't have to present beyond a reasonable doubt proof of any documents here to allow the experts to rely on them, Your Honor.

"Mr. Melnik seems to suggest I had a duty to present more. I don't. He's asking for records. I don't even know if it exists. I served a subpoena on U.S. Customs and Border. I asked them for all information they had in their possession regarding Mr. Paniagua's use or entry and exit into the country. This is what I got. It has his name, it has his passport number, it has the designation from Thailand.

"I think that's more than sufficient to allow an expert to make an opinion based upon the fact Mr. Paniagua lied about his whereabouts during the time from 1986 through 1998, and that's the relevance of the information, and that's how it comes in through the experts.

"THE COURT: Last word, Mr. Melnik?

"MR. MELNIK: Yes. I'm not sure where Mr. Barg comes up with the fact he lied about his whereabouts, because he testified in the last trial he went back and forth between El Salvador and Los Angeles starting in 1993, with the death of his father.

"The records that were subpoenaed corroborate that. The only abnormality is that this one document shows that he came from Trang Thailand—or arrived in Trang Thailand on a flight number that doesn't go to Thailand and to an airport that United doesn't service. It is certainly more prejudicial than probative. There is no probative evidence to this at all.

"Secondly, if the Court were to allow it in, we're going to have a mini trial on this particular issue, which is going to distract the jury. I'm going to have to bring in someone from United Airlines. He's probably going to have to bring in someone from Homeland Security. And over what? Because they say that they believe he lied about his whereabouts.

"There is no evidence of that based upon this record of where this flight went to. Mr. Paniagua testified prior to—in the last trial that when he arrived in the United States from El Salvador, he had a wife and was expecting a kid on the way, still in the womb, and two or three weeks after he arrived in Los Angeles, he got arrested, with full intent to go back to his family that he had back in El Salvador.

"So this saying he's in Trang Thailand is completely inconsistent with all the evidence in this case."

The court received assurances from both counsel that the matter was "submitted," and then made its decision, a decision that did not even mention Evidence Code section 352, let alone indicate the weighing required under that section. That decision was in its entirety as follows: "THE COURT: The Motion to Exclude Evidence that the defendant did go to Thailand is denied. We have a conflict in the evidence, and the jury can resolve it."

Counsel for defendant was not through, however, and three days later, on July 17, he obtained several court orders requiring United Airlines to provide him certain information, and that it respond to these questions:

Court order No. 2: "On August 21, 1998, was there a passenger named Carlos Paniagua on the passenger manifest on United Airlines flight number 842? Please provide the name of the airport he boarded the flight and the city

he deplaned if he appears on the passenger manifest. If no such person was on the flight, please so indicate."

Court order No. 3: "On August 21, 1998, was there a passenger named Carlos Paniagua on the United Airlines flight from Bangkok to LAX, if such a flight traveled on that date? If no such named person was on the flight passenger manifest, please so indicate. Please also indicate the time of arrival at LAX if the information is available."

Meanwhile, and before United Airlines responded to the questions, the Thailand document was injected into the case, used in the examination of the People's expert witnesses. For example, during the direct examination of Dr. Starr, the district attorney presented her with some border crossing documents, including the Thailand document. Dr. Starr agreed that, based upon that document, she could not determine whether defendant "spent a month, a year, or day in Thailand or was just passing through." Then, after Dr. Starr confirmed that defendant never mentioned being in Thailand to her (or apparently anyone else), the district attorney followed up by asking Dr. Starr if that meant "for the purposes of your opinion, can you really trust anything [appellant] says?" Dr. Starr responded "[n]o."

Shortly thereafter, Dr. Starr was examined about potential protective factors, one of which was maintaining employment, and stated they did not have reliable information about defendant's employment status. And, she went on to note, they did not know what defendant was doing or where he was, nevertheless stating, as though it were a fact, "[h]e was in Thailand in August of '98."

The district attorney also used the document in the questioning of Dr. Longwell. For example, presenting her with the Thailand document, the district attorney asked if defendant ever mentioned he had spent time in Thailand. Dr. Longwell said he had not, that other than referring to his two tours of duty in Vietnam, defendant never said he had been anywhere in Southeast Asia. The district attorney then asked Dr. Longwell whether, if there was evidence that United Airlines did not fly from Thailand and that the referenced flight was from New Zealand, that would affect the ability of experts to rely on the document in coming to a conclusion. Dr. Longwell responded that it would not, because she "would have to rely on them as an official record."

Defendant's counsel pursued the subject on cross-examination of Dr. Starr, who admitted that other than the document she had no information that defendant went to Thailand. Dr. Starr refused to agree that no one could testify that defendant was actually in Thailand, but did agree that she was

"not aware of anybody who has been found who could testify to that fact." Dr. Starr also acknowledged that she had no idea how the data entry was made to create the Thailand document or the source of information, but was assuming that the government was accurate, going on to say "I would doubt that the whole document is completely inaccurate."

That led to defense counsel's attempt to get Dr. Starr to acknowledge that her testimony would be undermined if it were shown that United Airlines flight No. 842 did not in fact fly from Thailand, but from New Zealand. Following objections to such questions, some sustained, some overruled, defense counsel's efforts resulted in a stipulation by the district attorney. The stipulation was this: records of United Airlines showed "that Flight 842, on August 21, 1998, flew from . . . Auckland to Melbourne to Los Angeles to Chicago."[10] Not Thailand.

During the redirect examination of Dr. Starr, the district attorney showed her defendant's passport, which had one stamp from El Salvador, on April 13, 1997. The district attorney again confirmed that "[w]hether or not United . . . Airlines flew [to Thailand], in any event, defendant did not tell you he went anywhere else; is that right?" Dr. Starr agreed, and later also agreed that defendant never told anyone he went anyplace other than El Salvador. And, she went on, while the Thailand document appears to be inconsistent with what defendant told the various experts, she would not reject it just because it is inconsistent with defendant's story.

In closing argument, the district attorney referred on many occasions to defendant's travel, and despite the stipulation, on some occasions specifically mentioning Thailand and on others referring to "border and custom control records and his general whereabouts." Thus, for example, adverting to defendant's credibility, the district attorney stated as follows: "We have the record that shows, whether it was in Thailand or not, a record showing he entered the country, according to the Border Control records, Thailand. Whether that was a connecting flight he took from someplace else, whether it was another location, how long he was there for we don't know, but we do know there is no stamp on his passport consistent with 1997 from El Salvador. We don't know where this man is, we don't know where he was, we don't know what he was doing, period."

Other references, while less direct in referring to Thailand, were no less vouching for the accuracy of the document. Thus, for example, the district attorney criticized one defense expert "who refuses to accept the Border and

---

[10] The district attorney also stipulated that defendant's counsel had requested United Airlines to respond to court orders Nos. 2 and 3 quoted above, and that United Airlines did not have records of passenger data before 2001.

Custom Patrol records for proof that Mr. Paniagua is lying about his whereabouts, certifying records to the effect . . . ." And another, who was criticized because "without a breath taken, without a thought he rejected the Border Patrol documents."

Later, the district attorney argued that "We are not to feel sorry for this man in any way, but again, we're not to give him credit where no credit is due. This man disappeared for years. We don't know where he was. You will have the documents here when you [go] into the jury room, the passport, the Border Patrol records, you will have the probation reports explaining the details of the offenses. You will see what Mr. Paniagua had done and when he did it." And, the district attorney would argue, the fact that other evidence might have been introduced was of no moment: "The idea that we, the People, could have gotten more evidence, the boarding cards themselves, other experts in here, other testimony, we very well may have been able to. I can't tell you. I don't know what specific facts, what specific evidence. But I can tell you the fact that additional evidence may have been procured doesn't mean we failed to meet our burden of proof."

And so the district attorney summed up in his opening argument: "Just because we're not catching a person for commission of these offenses doesn't mean they are doing it, but it doesn't mean they are not doing it. When we have evidence that this person has left the country repeatedly. I mean, there is some suggestion that we can call Interpol and check his fingerprints. You know, fine . . . [¶] The bottom line is that it is correct we have no evidence he was re-offending, but the fact he was out of the country, the fact we don't know what he's doing, is not a factor we consider . . . ."

Faced with all this, defendant's counsel argued the absence of direct evidence, that the evidence was only circumstantial—and at that based on a document with many errors in it. And then defense counsel addressed the Thailand issue in point-blank terms, saying this:

"[L]ook, let's just not beat around the bush here. You know that the reason this whole Thailand thing got brought up is because child molesters go to Thailand. We know exactly what Thailand is. You know that is where they were going in this case, but it's brought up under the auspices he lied about his whereabouts. Baloney. That is why I had to attack it as hard as I could. I am the one that asked for court orders so that United Airlines would provide the passenger manifest information not only for Flight 842, which went from Auckland to LA, but any flight on that date from Bangkok to LA. I asked for it.

"What would have happened if he was on the flight manifest from Bangkok? Well, I would have been in trouble. So the inference is maybe I'm

comfortable with the fact I'm looking for that information, because he didn't go to Thailand and he wasn't on that flight from New Zealand. But that record is good enough for them. But when you look at his criminal history record, his rap sheet, the fact no offenses are on there, that's not good enough for them. Double standard.

"They're going to use the Thailand information, which is weak and with all the errors in it, to say he went to Thailand, but when the official risk assessment sheet says he doesn't have any offenses, not even a detention or an arrest or a suspicion or anything, conviction, they are not willing to use that. Oh, you know, we don't know where he was. I mean that's just not right."

And defense counsel argued, this time focused on Dr. Longwell, there is "[o]ne instance in all of her evaluations that should go outside of the rap sheet to see where somebody was. Why are they making it different in this case? Because they don't like the offenses that he committed. That's the only reason they are going so far in this case to bend the scoring rules, to stay offense free in the community doesn't count, to proffer this evidence he's in Thailand. I cannot, for the life of me, believe that after what's been shown in this case, they are still sticking to the fact he was in Thailand. . . . I can't believe that."

### Defendant's Argument on Appeal

Defendant contends that "the entire subject of Thailand should have been excluded from the trial and that the expert witnesses should not have been informed of or permitted to rely upon the Thailand document in forming their opinions." His reasoning runs as follows: "[T]he trial court erred in permitting the Thailand evidence to be presented to the mental health experts and the jury for three separate but interrelated reasons. First, the evidence was not admissible under Evidence Code section 1280 as a record by a public employee . . . [b]ecause it did not comply with Section 1280, subdivision (c), insofar as the information about the document did not indicate its trustworthiness. Second, the evidence could not properly be relied upon by an expert witness under Evidence Code section 801 because it was not, within the meaning of Section 801, subdivision (b), a matter 'of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.' Finally, the evidence should have been excluded under Evidence Code section 352, as being substantially more prejudicial than probative."

We agree with defendant's Evidence Code section 352 argument, and conclude that the trial court erred in admitting the evidence concerning Thailand—and that the error was prejudicial.[11]

### The Law and the Standard of Review

Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

■ The "undue prejudice" mentioned in Evidence Code section 352 has a distinct meaning. It is not synonymous with evidence that is merely damaging to the defendant. (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Evidence is "unduly prejudicial" when it " '. . . tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Samuels* (2005) 36 Cal.4th 96, 124 [30 Cal.Rptr.3d 105, 113 P.3d 1125], quoting *People v. Crittenden* (1994) 9 Cal.4th 83, 134 [36 Cal.Rptr.2d 474, 885 P.2d 887]; accord, *People v. Cole* (2004) 33 Cal.4th 1158, 1197 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

One way the Supreme Court has stated the concept is this: evidence is substantially more prejudicial than probative within the meaning of Evidence Code section 352 if " 'it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] 'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 805 [38 Cal.Rptr.3d 98, 126 P.3d 938].) Another, most recently, is this: "the test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145 [144 Cal.Rptr.3d 865, 281 P.3d 924], citing *People v. Doolin* (2009) 45 Cal.4th 390, 439 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

---

[11] Evidence Code sections 1280 and 801 were not mentioned by defendant below, either in his motion in limine or his argument, and defendant did not seek to have the document excluded under either section. Those statutes are consequently unavailable for defendant's use in establishing error on appeal. (Evid. Code, § 353, subd. (a); *People v. Kennedy* (2005) 36 Cal.4th 595, 612 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Vera* (1997) 15 Cal.4th 269, 275 [62 Cal.Rptr.2d 754, 934 P.2d 1279].)

"An appellate court applies the abuse of discretion standard to review any ruling by a trial court on the admissibility of evidence, including a ruling on an Evidence Code section 352 objection." (*People v. Cox* (2003) 30 Cal.4th 916, 955 [135 Cal.Rptr.2d 272, 70 P.3d 277].) That means reversal is not appropriate unless we are compelled to conclude that the trial court " ' "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 634–635 [75 Cal.Rptr.3d 691, 181 P.3d 1035].)

■ Many cases have noted that in ruling on an Evidence Code section 352 objection "a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so." (*People v. Williams* (1997) 16 Cal.4th 153, 213 [66 Cal.Rptr.2d 123, 940 P.2d 710]; see *People v. Doolin, supra,* 45 Cal.4th at p. 438.) However, as Justice Simons has instructed in his manual, "the better practice is for the trial court to weigh the probative value against the reasons for exclusion on the record. This will provide appellate courts with a record necessary for meaningful review of any claim for abuse of discretion and ensures 'that a ruling on the motion "be the product of a mature and careful reflection on the part of the judge," i.e., to "promote judicial deliberation before judicial action." ' [Citations.]" (Simons, Cal. Evidence Manual (2012) § 1:25, p. 32.)

But even if the "better practice" is not a requirement, what is required is that the record demonstrate that "the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams, supra,* 16 Cal.4th at p. 213; see *People v. Doolin, supra,* 45 Cal.4th at p. 438; *People v. Lucas* (1995) 12 Cal.4th 415, 449 [48 Cal.Rptr.2d 525, 907 P.2d 373].) What this means, according to a leading practical treatise, is that "[t]he weighing process under [section] 352 depends upon the trial court's consideration of the unique facts and issues of each case . . . ." (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2011) § 8:3256, p. 8F-15 (rev. # 1, 2011).) Or as we put it in *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 947 [252 Cal.Rptr. 716], where we reversed for error in improperly excluding evidence, the record must show that the court exercised "its discretion in an informed manner." The record here does not measure up. Indeed, there was no weighing at all.

As shown from the excerpt from the hearing on the motion in limine, the trial judge ruled that "we have a conflict in the evidence, and the jury can resolve it." But the "conflict in the evidence" went to the issue of authenticity, which has nothing to do with the weighing of prejudice versus probative value required under Evidence Code section 352. Put otherwise, the trial court may have determined the first step on a 352 analysis, though we do not

understand that an issue of authenticity is one for the jury to resolve. The trial court certainly did not rule on the second. (See *People v. Bryden* (1988) 63 Cal.App.4th 159, 185 [73 Cal.Rptr.2d 554] ["In reviewing the trial court's decision, we consider '(1) whether the challenged evidence satisfied the "relevancy" requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value . . . was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.' [Citation.]"].)

In sum, there was no weighing whatsoever. No discretion was exercised—as well illustrated by the absolute silence on the subject of sanitization.

As quoted above, defendant's motion in limine argued that at the very least the Thailand document be "sanitized." Defense counsel made a similar argument at the hearing. The trial court ruled as it did without even discussing the subject, this despite the People's position below, which was that the Thailand document should be admitted to impeach defendant's testimony that he was not out of the country. The Attorney General's position on appeal is similar: "The prosecution witnesses suggested only that [defendant's] presence in another country, whether it was Thailand, El Salvador, or New Zealand, demonstrated that appellant's whereabouts could not be properly accounted for during the period between 1986 and 1998, and could not thereby mitigate his risk of reoffense. [Citations.] The evidence also supported the prosecution's experts' opinions that appellant had not been forthcoming in his account of his whereabouts, which affected his credibility in his various statements to the experts. [Citations.]"

This being the People's position, it could have been well served by sanitizing the document in some fashion, which could easily have been accomplished, by stipulation or otherwise, the effect of which would have been to allow the jury to hear that defendant had been in, and returned from, some foreign country—just not Thailand. (See generally Simons, *supra*, § 3:64, pp. 285–286 [discussing sanitizing prior felony convictions for the same crime].) It was not to be, and "Thailand" was before the jury, in the examination of witnesses and the closing argument. It was error.

■ There can be no doubt that allowing a jury to hear evidence of unsavory conduct can be reversible error due to its prejudicial effect. (See *People v. Ortiz* (1979) 95 Cal.App.3d 926, 933–934 [157 Cal.Rptr. 448] [questions about defendant's unusual religious beliefs, which included animal sacrifice, held reversible error, as questioning on collateral matters, with no obvious purpose other than to degrade defendant]; *Winifred D. v. Michelin*

*North America, Inc.* (2008) 165 Cal.App.4th 1011, 1026, 1029 [81 Cal.Rptr.3d 756] [introduction of plaintiff's extramarital affairs to contradict testimony at deposition allowed over Evid. Code, § 352 objection held reversible error, as affairs were irrelevant and "[t]o the extent the evidence was relevant to . . . credibility," impeachment on collateral matter was more prejudicial than probative]; see also *People v. Phillips* (1985) 41 Cal.3d 29, 49–51 [222 Cal.Rptr. 127, 711 P.2d 423] [no abuse of discretion in excluding evidence that prosecution witness was a prostitute].)

So, too, here, where we conclude that allowance of the Thailand evidence was prejudicial error.

Defendant argues that there is an "objective basis" for finding prejudice here: nothing about Thailand was introduced in defendant's first trial, which ended in a hung jury; Thailand was introduced in the second trial, where the jury found against defendant. While we may not agree with defendant's adjectival description, this certainly is one fact helping to show prejudice. But there is much more.

The case was hotly contested, the evidence hardly one-sided, let alone overwhelming. As indicated above, the expert testimony was elaborately presented, through two experts on behalf of the People, and three experts on behalf of defendant. It was, in a word, a "close" case, which in fact took the jury three full days of deliberation to decide. Such lengthy deliberations bear favorably to defendant on the issue of prejudice. (See generally *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.* (1984) 36 Cal.3d 752, 771–773 [206 Cal.Rptr. 354, 686 P.2d 1158], overruled on other grounds in *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 87–88 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

The People's expert witnesses acknowledged that if defendant were given credit for being offense free in the community for 12 years, it could support an opinion that he was not an SVP. And the jury could reasonably have concluded that defendant's trips to El Salvador—which he did not deny— were not indicative of a significant possibility of wrongful conduct by him and therefore not to be held against him. Not so the trip to Thailand.

The Attorney General takes issue with defendant's argument about the purport of the Thailand evidence as a place where pedophiles go to have sex with children. In the Attorney General's words, defendant's claim is "an assumption without support in the record. Moreover, even if some members of the jury may have some knowledge of Thailand's alleged reputation, the jury was instructed that it was to make 'a decision in this case *based only on the evidence that has been presented to you in this trial.*' "

As defendant observes, however, "prejudicial matter of common knowledge would never appear in a trial record as evidence that went to the jury. That is the whole problem with such matters." Or, as defendant later puts it, the "prosecution did not explicitly tell the jury that [defendant] may have gone to Thailand to have sex with children because there was no need to make the claim explicit. It was implicit in the mere mention of Thailand." (See generally *U.S. v. Donnelly* (N.D.Cal., June 30, 2005, No. CR 05-0181 SI) 2005 WL 1575270, p. *4 [where, denying a motion to suppress evidence obtained under a search warrant, the district court relied in part on an affidavit from a United States special agent that ". . . Thailand is recognized as a popular destination for individuals interested in child sex tourism . . . .].")

Finally, that the Thailand evidence was ostensibly used for the purposes of impeaching defendant and as the basis for expert testimony does not eliminate the prejudice, as shown by *People v. Coleman* (1985) 38 Cal.3d 69 [211 Cal.Rptr. 102, 695 P.2d 189], disapproved on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32 [144 Cal.Rptr.3d 84, 281 P.3d 1]. There, the defendant appealed his conviction of two counts of first degree murder, one count of second degree, and assault with intent to murder, resulting from the gunshot deaths of his wife, son, and niece, and the near death of his daughter. The defendant took the stand and testified he had not thought of killing his family before the shootings. The People had three letters written by defendant's wife months before her death which stated he had threatened to kill her "many" times. After proving that the defendant had discovered one of the letters about a month before the killings, the district attorney was allowed to use it to impeach the defendant. And because expert medical witnesses had considered the letters in forming opinions that the defendant had a paranoid personality disorder, repeated reference to the letter was permitted during their testimony, after the trial court—unlike the court here—had given a limiting instruction. (*Coleman*, at pp. 81, 82.)

The Supreme Court found reversible error: "Although the trial court ruled the letters' contents admissible only for the limited purposes of impeaching defendant's credibility and to explain and challenge the basis for the opinions of the psychiatric experts, and carefully instructed the jury on these limited proper uses for the letters, we agree with defendant that these instructions did not—and could not—adequately insure that the letters would not be considered as proof of the truth of the hearsay accusations they contained. The abuse of discretion in this case constituted prejudicial error. (*People v. Hamilton* [(1961)] 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473]; *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580].)" (*People v. Coleman, supra*, 38 Cal.3d 69 at p. 81.)

■ As we read the record, the district attorney took every opportunity to have his experts mention Thailand. Even after the information from United Airlines showed the unreliability of the Thailand evidence—indeed, after the stipulation—the district attorney did not back down. Defendant aptly sums it up this way: "The prosecutor's actions before, during, and after the stipulation made it clear to the jury that the prosecutor still stood by his claim that [defendant] had traveled to Thailand and lied about it. Whatever the stipulation might have said about United Airlines not flying to Trang, Thailand, the jury surely would have assumed that the judge would not have permitted the prosecutor to present evidence that was unreliable. As a result, the decision to allow the evidence to go to the jury, in effect, told the jury that the evidence had some reliability."

We conclude that the trial court's erroneous ruling resulted in a miscarriage of justice, that it is reasonably probable that if the jury had not heard at all—let alone countless times—about Thailand, it would have returned a verdict more favorable to him. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The error " 'pose[d] an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" . . . .' " (*People v. Jablonski, supra*, 37 Cal.4th 774, 805.)

## Possible Issues on Retrial

Defendant's other claims of evidentiary error may or may not arise on any retrial, but his claim of instructional error would. Thus, for the benefit of the trial court on any such retrial, we address certain of defendant's other claims.

### No Error in Excluding Evidence of Why an Uncompleted Study of Recidivism Was Terminated

Dr. Jesus Padilla, a DMH employee since 2000, testified that "I worked with the sexually violent predators on the Sex Offender Commitment program, and part of my job was to design the research project to look at the recidivism rates—compare the recidivism rates in those who had been treated versus those who have not been treated. The study is to find out how effective the treatment program is." Dr. Padilla became the head of the Program Evaluation Research Committee, and as part of the responsibility "it was my job to design the study that would . . . evaluate our program." Once he secured official approval for the project, he began gathering data. And by 2006 the preliminary results were that 6 percent of sexual offenders, and 4.4 percent of sexually violent offenders, reoffended. No further reports were prepared. Over the prosecution's objection, defendant was permitted to have Dr. Padilla testify about his uncompleted study. However, by virtue of Evidence Code section 352, the court would not allow the defense to have

him testify about the reasons why the study was never completed or why he was no longer employed by the DMH.[12]

Defendant treats this ruling as a violation of his due process rights to a fair trial. In his words: "During the course of this study, Padilla determined that the reoffense rates for persons sent to the system and then released was much lower than anticipated. When information about this study became public, the DMH shut down the study and launched an attack on Padilla's professional credibility and ethics. [¶] . . . The DMH is the agency not just responsible for confining and treating alleged SVPs but for designing the evaluation process by which such persons would be identified for training the evaluators. Evidence of systemic bias by that agency is relevant to the credibility of each of the DMH's expert witnesses and the entire legal system as it relates to these proceedings. While the evidence proffered by appellant would not have proved, conclusively, the existence of a systemic bias or a conspiracy to suppress evidence, those would have been reasonable conclusions based upon the evidence appellant sought to present. By excluding this evidence, trial counsel allowed the State of California to present itself, and its witnesses in a false light as unbiased independent witnesses rather than active partisans engaged in a course of misconduct. As a result, the jury never learned that Padilla's study was shut down because the DMH did not like the results and that its expert witnesses would be expected to toe the party line on the issue of recidivism rates for California sex offenders."

Viewed in the context of what was then facing the trial court (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 [78 Cal.Rptr.3d 272, 185 P.3d 708]), the prospect of what defendant proposed to elicit from Dr. Padilla truly had the potential to dismay. The focus of the jury's attention would shift from defendant to the internal bureaucratic workings of the DMH—and the why and wherefore of the termination of Dr. Padilla's study. If that tale was to be told by Dr. Padilla, the hearsay problems looked to be considerable. And if that difficulty was to be surmounted, the parade of witnesses needed to fix the motive and responsibility for that termination would only move the jury's attention further away from the issue that would ultimately be submitted for them for determination. Defendant's use of the word "conspiracy" only underscores the risk—to use the trial court's characterization—of the jury being "distracted" from the issue that would be submitted for its decision. The circumstances attending Dr. Padilla's separation from state employment would only aggravate that situation.

---

[12] Evidence Code section 352 was twice cited by the prosecutor in opposing introduction of Dr. Padilla's testimony. Although this provision was not expressly mentioned by the trial court, its ruling that "I don't think that his employment history and his degree to which he is pleased or displeased with the Department of Mental Health has sufficient probative value to overcome the distraction from the issues that such a rendition would present" is treated by the parties as being based on section 352. We have the same reading.

As indicated, the trial court's ruling allowed the jury to know that Dr. Padilla had begun his study, that its preliminary results hardly favored the prosecution, and that nothing more had been done after 2006. As defendant frames the issue, the credibility of Drs. Starr and Longwell, both of whom had been cross-examined extensively, might require them to be re-called to reconsider their testimony in light of Dr. Padilla's testimony. In other words, a lengthy trial might be even further extended. Having read the record, the trial court's ruling seems to have struck a more than reasonable balance between the due process right of defendant to present a defense and the court's natural desire not to have the trial stretch out interminably. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 106 S.Ct. 1431]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 494 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Box* (2000) 23 Cal.4th 1153, 1203 [99 Cal.Rptr.2d 69, 5 P.3d 130].) We cannot conclude that it " 'pose[d] an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" . . . .' " (*People v. Jablonski, supra*, 37 Cal.4th at p. 805), or that allowing the jury to know of it was so "arbitrary, capricious or patently absurd" that it resulted in a manifest miscarriage of justice. (*People v. Williams, supra*, 43 Cal.4th at pp. 634–635.)

■ Although defendant attempts to frame the issue as one of federal constitutional dimension, this is not correct. "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.] Although completely excluding evidence of an accused's defense could theoretically rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.] If the trial court misstepped, '[t]he trial court's ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.' [Citation.] Accordingly, the proper standard of review is that announced in *People v. Watson*[, *supra*,] 46 Cal.2d 818, 836, 299 P.2d 243, and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103 [31 Cal.Rptr.2d 321, 875 P.2d 36]; accord, *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391].) Application of Evidence Code section 352 is within this principle. (*People v. Brown* (2003) 31 Cal.4th 518, 545 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

### No Error Occurred in Limiting Defendant's Right to Cross-examine One of the DMH Experts

During defendant's extensive cross-examination of Dr. Starr, the court became aware that defense counsel had exchanged e-mails with several

experts in the field, including Dr. Karl Hanson, whom Dr. Starr had cited in her testimony, and Dr. Barbaree, who would subsequently testify for the defense. Defense counsel argued that use of the e-mails would be proper during cross-examination, because they would demonstrate that Dr. Starr was scoring defendant improperly according to the criteria of the STATIC-99 test. The People responded that use of the e-mails would amount to having the opinions of the e-mail authors put before the jury without affording the prosecution the opportunity to cross-examine them. The trial court agreed with the People. Defendant contends this was error. We disagree.

Defendant's appointed counsel presents his claim ably, reiterating the points made by trial counsel. But to no avail, especially in light of the language of the e-mails themselves. For example, Dr. Hanson's e-mail of July 29, 2008, is all of five lines where, responding to defense counsel's presenting what appears to be a hypothetical question based on counsel's submitted details, Dr. Hanson stated, "I agree with *your analysis*." (Italics added.) Similarly, Dr. Barbaree, in his December 21, 2007 response, thanked defense counsel "for requesting *my opinion*," and on the crucial point of how defendant should be scored on the STATIC-99 test, simply stated: "I agree with *your position* on this issue." (Italics added.) Whatever other problems are presented by the issue, we fail to see how a *defense attorney's opinion* on a subject outside his or her expertise is appropriate.

In Dr. Hanson's second e-mail, dated June 10, 2008, he addressed a particular factor used in the STATIC-99 test, namely, whether the subject was "offense free in the community" for an extended period of time. Most of Dr. Hanson's response was composed of comments and asides, but he did state a tentative conclusion: "The narrative is more complicated than usual, but I am inclined to give him the credit for being offense free in the community." In his e-mail dated August 4, 2008, Dr. Thornton responded to defense counsel's solicitation to "weigh in" with the following: "Based on the fact picture given below are my thoughts."

■ Defendant claims his constitutional right of cross-examination was violated, but reasonable restriction of the right to cross-examine is consistent with the Sixth Amendment. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 679; *People v. Hillhouse, supra*, 27 Cal.4th at p. 494; *People v. Quartermain* (1997) 16 Cal.4th 600, 623–624 [66 Cal.Rptr.2d 609, 941 P.2d 788].) Here, we note that defendant was afforded abundant opportunity for cross-examining Drs. Starr and Longwell—indeed, cross-examination that far exceeded that consumed by the direct examination. There was no error, let alone prejudicial error.

## No Instructional Error Occurred

The trial court instructed the jury with CALCRIM No. 3454:

"The Petition Alleges that Carlos Paniagua is a sexually violent predator. To prove this allegation, the People must prove beyond a reasonable doubt that; one, Carlos Paniagua has been convicted of committing sexually violent offenses against one or more victims;

"Two, Carlos Paniagua has a current diagnosed mental disorder;

"Three, as a result of that diagnosed mental disorder, Carlos Paniagua is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior.

"And, four, to keep Carlos Paniagua in custody in a secured facility is necessary to ensure the health and safety of others.

"You may not conclude that Carlos Paniagua is a sexually violent predator based solely on his prior offenses without additional evidence that he currently has such a current diagnosed mental disorder. Amenability to treatment is not required for a finding that a person is a sexually violent predator, nor is amenability required for treatment of that person.

"Treatment is not limited to successful treatment or potentially successful treatment, nor does treatment mean that the person must recognize that either he or she has a mental disorder and willingly participate in a treatment program.

"The term 'diagnosed mental disorder' includes conditions either existing at birth or acquired after birth and impair a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others.

"A person is likely to engage in sexually violent predatory behavior if there is a substantial danger that is a serious and well-founded risk that the person will engage in such conduct if released into the community. The likelihood that the person will engage in such conduct doesn't have to be greater than 50 percent."

Defendant requested that this instruction be augmented, and a pinpoint instruction added, to underscore the requirement that defendant must have an

inability to control his sexually predatory behavior.[13] We reject defendant's claim that it was prejudicial error to refuse his requests.

It is *People v. Williams* (2003) 31 Cal.4th 757 [3 Cal.Rptr.3d 684, 74 P.3d 779] that stands in the way. There, applying *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867] and *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072]—both of which involved the statutory scheme upon which California's SVP Act was modeled—our Supreme Court rejected a claim that a commitment order was invalid "because the statute's literal language fails to express the federal constitutional requirement of proof of a mental disorder that causes 'serious difficulty in controlling behavior' [citation], and the jury was not specifically instructed on the need to find such impairment of control. For reasons we now explain, we reject this contention." (*Williams*, at p. 764.)

"[I]n essence, *Kansas v. Crane* . . . (1) confirmed the principle of *Hendricks* . . . that a constitutional civil commitment scheme must link future dangerousness to a mental abnormality that impairs behavioral control, while (2) making clear that the impairment need only be serious, not absolute. *Kansas v. Crane* reiterated *Hendricks*'s holding that within wide boundaries, state legislators may define this difficult-to-articulate concept as they wish, and acknowledge *Hendricks*'s earlier conclusion that the Kansas statute articulated it sufficiently. [¶] Nowhere did *Kansas v. Crane* . . . suggest that the Kansas law so recently upheld *as written* in *Hendricks* could be constitutionally applied only with supplemental instructions, language *not* chosen by Kansas's legislators, pinpointing the impairment-of-control issue." (*People v. Williams, supra,* 31 Cal.4th at pp. 773–774.) "In our view, a judicially imposed requirement of special instructions *augmenting* the clear language of the SVPA would contravene the premise of both *Hendricks* . . . and *Kansas v.*

---

[13] Defendant requested that CALCRIM No. 3454 be modified with this language: "The term diagnosed mental disorder includes a condition either existing at birth or acquired after birth that affects a person's emotional or volitional capacity, that is, their ability to control their emotions or volition which causes serious difficulty in controlling behavior that predisposes that person to commit criminal and sexual acts to an extent that makes him or her a menace to the health and safety of others."

The rejected pinpoint would have told the jury: "A critical distinguishing feature of a diagnosed mental disorder is a serious lack of ability to control behavior. Before you may vote the petition to be proved beyond a reasonable doubt, it must also be proven that respondent has a serious difficulty controlling his sexually violent predatory behavior. When viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental disorder itself, the serious difficulty in controlling behavior must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality or disorder subjects him to civil commitment from, as apart from the dangerous but typical recidivist convicted in an ordinary criminal case. The fact that respondent did not control his behavior does not prove that he was unable to do so. There must be evidence that respondent tried to control his behavior and that he encountered serious difficulty when trying to do so, and that his difficulty was caused by a mental disorder."

*Crane,* . . . that, in this nuanced area, the *Legislature* is the primary arbiter of how the necessary mental-disorder components of its civil commitment scheme shall be defined and described." (*Id.* at p. 774.)

"The SVPA's plain words . . . 'distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.' [Citation.]" (*People v. Williams, supra,* 31 Cal.4th at pp. 759–760.) "Accordingly, separate instructions or findings on that issue are not constitutionally required, and no error arose from the court's failure to give such instructions in defendant's trial." (*Id.* at p. 777, fn. omitted.)

The Supreme Court has never repudiated this view, which alone makes it dispositive. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Defendant, presumably aware of this reality, cites *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] and *People v. Galindo* (2006) 142 Cal.App.4th 531 [48 Cal.Rptr.3d 241] in an attempt to persuade us that the statutory language of the SVP Act, "merely by its existence, does not necessarily contain within it the necessary information that a jury needs in order to decide whether the defendant has a serious difficulty in controlling his dangerous behavior." This effort must fail because, as the Attorney General notes, the point defendant is making "is exactly what [*People v.*] *Williams*[, *supra,* 31 Cal.4th 757] recognized. *Howard N.* and *Galindo* held that the statutory language of *other* civil commitment schemes . . . did not contain the constitutionally necessary requirement of volitional impairment as was included in the SVPA. ([*In re Howard N., supra,*] 35 Cal.4th at pp. 132–136; [*People v. Galindo, supra,*] 142 Cal.App.4th at p. 536.) Indeed, the *Howard N.* court reaffirmed the holding in [*People*] *v. Williams*[, *supra,* 31 Cal.4th 757]—that jury instructions including the statutory language of the SVPA adequately conveyed the requisite requirement of serious difficulty controlling behavior. ([*In re Howard N., supra,*] 35 Cal.4th at p. 130.)"

## The Constitutional Claims

As indicated, defendant presents a number of constitutional challenges to the SVP statutory scheme, arguing as follows: it violates his "due process rights because it permits him to be committed indefinitely while placing the burden of proof on him to prove that he no longer qualifies as an SVP. The law violates his right to be protected from *ex post facto* and double jeopardy . . . because the SVP statutes are now punitive, rather than civil in

nature."[14] Defendant further contends that the SVP scheme violates his equal protection rights "under both the state and federal constitutions."

In light of our reversal of the commitment order, we do not reach these claims, and save them for another day when, and if, they become pertinent.

## DISPOSITION

The order committing defendant to the State Department of Mental Health is reversed.

Kline, P. J., and Lambden, J., concurred.

---

[14] Defendant acknowledges that because the California Supreme Court rejected identical claims in *People v. McKee* (2010) 47 Cal.4th 1172 [104 Cal.Rptr.3d 427, 223 P.3d 566], "this Court must reject appellant's due process, *ex post facto*, and double jeopardy claims as required by *Auto Equity Sales v. Superior Court*[, *supra*,] 57 Cal.2d 450," but he reiterates his claims "in order to preserve his right to take his federal constitutional claims to the United States Supreme Court."