Filed 3/29/13  P. v. Laird CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JEREMY LEE LAIRD,<br><br>        Defendant and Appellant. | A135134<br><br>(Solano County<br>Super. Ct. No. FCR289508) |

**I.**

**INTRODUCTION**

In the middle of the night, someone hot-wired a car, and then crashed it into another car parked nearby.  Awakened by a banging noise, a neighbor saw a shadowy male figure, possibly wearing a backpack, running toward a nearby golf course.  Police arrived moments later.  One of them glimpsed someone disappearing into the woods next to the golf course.  At the spot where the person was seen, police found a recently dropped backpack.  The backpack contained shaved car keys, other car theft-related equipment, and a methamphetamine pipe.  The police searched the adjoining woods with a dog, and found appellant there half an hour later, standing in a creek.

Two years earlier, another car theft occurred in the same neighborhood, also during the night.  Later the following day, police found appellant and another man sitting in the stolen car.  Inside the car, police found a backpack containing shaved car keys and appellant's identification.  Appellant also had a methamphetamine pipe in his pocket.  Appellant pleaded no contest to the charges arising from this earlier incident.

1

At appellant's trial in the present case, evidence of his prior car theft was admitted on the issue of common plan or scheme. Appellant argues the admission of this evidence was reversible error. We disagree, and affirm.

## II.

## PROCEDURAL BACKGROUND

On December 27, 2011, an information was filed charging appellant with felony vehicle theft (Veh. Code, § 10851, subd. (a)) and possession of a device used for smoking a controlled substance (Health & Saf. Code, § 11364).[1] The information also alleged, with respect to the vehicle theft count, that appellant had prior convictions for vehicle theft (Pen. Code, § 667.5), and had served prior prison terms without remaining free from custody for five years between convictions (Pen. Code, § 667.5, subdivision (b)).

Jury trial commenced on February 15, 2012. At the conclusion of the trial, the jury found appellant guilty on both counts. Appellant waived jury trial with regard to the prior conviction allegations, and the trial court found the prosecution had proven that appellant had one prior car theft conviction and had served three prior prison terms. On March 16, 2012, appellant was sentenced to the mid-term of three years on the vehicle theft count, plus one year for the Penal Code section 667.5, subdivision (b) enhancement, with the sentence for the paraphernalia count and the other enhancements stayed under Penal Code section 654. The court ordered that appellant serve one year in custody, to be served in the county jail under Penal Code section 1170, subdivision (h), and stayed the remaining three years, with the proviso that appellant remain under supervision during that period pursuant to Penal Code section 1170, subdivision (h)(5). This timely appeal followed.

---

[1] The information included several other counts, but they were dismissed on the prosecution's motion prior to trial, and are irrelevant to the issues on this appeal.

## III.

## EVIDENCE AT TRIAL REGARDING CHARGED CRIMES

On August 22, 2011, Brandon Kannier, who lived near the Paradise Valley Golf Course in Fairfield, heard a large bang on the side of his house sometime during the night. He immediately got up and went outside, where he saw a person run across the street and over the lawn of the house directly across the street from his. It was very dark, and all Kannier could see was that the person was about six feet two inches tall and weighed between 220 and 240 pounds; from the person's height and build, Kannier assumed it was a man. The person appeared to be wearing dark clothing, and had something bunched against his back, like a sweatshirt hood or possibly a backpack, and possibly also a hood or hat.

When the person reached the nearest intersection, he turned onto the cross street and headed north toward the golf course, and Kannier lost sight of him. Kannier then went back inside, and learned that his wife had called 911. She handed him the phone, and asked him to speak with the police dispatcher. Kannier told the dispatcher that he thought the person he saw might have been Black, but that he was not sure, and gave the dispatcher his best estimate of the person's height and weight. Kannier did not see the person well enough to identify him, but based on appellant's silhouette, it could have been appellant.

During the early morning hours on the same night, John Certeza, who lived on the same street as Kannier, was awakened by his girlfriend's brother, who informed Certeza that his car, a 1988 or 1990 Honda CRX, was underneath another car two or three houses down the street. Certeza went out and looked at the car, and saw that the ignition switch, which had previously been intact, was now broken, and looked as though someone had tampered with it. Wires were dangling from the steering column. Certeza did not see how the collision occurred, and did not see anyone leaving the area afterwards.

Khoi Hoang, who also lived on the same street, was awakened early that morning when Certeza rang his doorbell. Hoang emerged onto a balcony, from which he could see that Certeza's CRX had been driven into the rear of Hoang's Honda Accord, so that

3

the CRX ended up underneath the Accord. Like Certeza, Hoang did not see how the collision occurred, and did not see anyone sitting in, or running from, the CRX.

Fairfield police officer Tyler Quinn investigated the incident, arriving at about 2:20 a.m. in response to a dispatch that initially referred to a suspicious person, possibly a Black male adult, and then changed to a vehicle collision. Once on the scene, Quinn spoke to Kannier about the person Kannier had seen. Kannier initially told Quinn it was a Black male adult, but when Quinn questioned him further, Kannier stated that he could not confirm the person's race. For that reason, Quinn first told the other responding officers by radio that the suspect was Black, but updated that soon thereafter to say the person's race was not known. At trial, Quinn testified that appellant appeared to him to be White. After appellant was later found and arrested, Quinn did not ask Kannier to look at appellant to see whether appellant was the man Kannier saw running away, because Kannier had not seen the person well enough to be able to identify him.

After Quinn arrived, he saw that the CRX appeared to have hit the back of the Accord, which was parked at the curb in front of Hoang's house. The hood of the CRX was warm, but that of the Accord was cold. The driver's door of the CRX was wide open; the bottom part of the steering column had been removed and was lying on the floorboard; and the ignition switch and some wires were dangling down from the steering column, in a manner consistent with one possible method of stealing a car.

Inside the CRX, Quinn found a shaved-down Volkswagen key on the floorboard below the dangling ignition switch. Such shaved keys are used by car thieves to enter and start cars; typically, people who have them carry more than one. The key Quinn found did not belong to Certeza or his girlfriend, and was not in the CRX when Certeza last saw it before the incident.

Fairfield police officer Dale Golez was also dispatched to investigate what was reported as a hit-and-run collision involving a black male suspect. At about 2:25 a.m., Golez arrived at the Paradise Valley Clubhouse, which is adjacent to the main road leading into the neighborhood where the incident occurred. While there, Golez spotted the backlit outline or silhouette of a person, apparently male, near the landscaped area

4

around the clubhouse.  Golez could not see the person's clothes, race, or coloring, and could not tell if the person was holding a backpack.

Soon after Golez spotted him, the person disappeared into some trees and shrubs. Golez turned on all his lights, including a spotlight, and made an announcement over his patrol car's PA system identifying himself as a police officer and directing the person to come out, but no one emerged.  Instead, Golez heard rustling noises that sounded like the person was moving away, further into the trees.  Golez relayed what he had seen to the other officers who were nearby, and they took steps toward establishing a perimeter to confine the person in the wooded area so that an officer with a dog could find him.

Police officer John Divine soon arrived with his German Shepherd police dog, Cargo.  Golez, Divine, and Cargo went to the spot where Golez had last seen the person. Once there, they found a backpack, which was dry despite the fact that the nearby sprinklers were on.  Because it was dry and free of dirt and debris, the backpack did not appear to have been there very long.

Officer Divine then made a loud announcement to the effect that a canine unit was there, and that the dog would be sent in and would bite the person if the person did not come out.  There was no response, so the officers and Cargo proceeded into the heavily wooded area nearby.  A creek, at the bottom of a three- to five-foot deep ravine, runs through that area in a north-south direction.  Cargo, who was off leash, appeared to be trying to pick up and follow a scent trail.  After about half an hour, Golez heard yelling, from which he concluded (correctly, as he soon found) that Cargo had found and bitten appellant.

When Golez reached the source of the yelling, he saw appellant standing in the middle of the creek, even though the ambient temperature was "kind of cold . . . at that hour."  Appellant's hand was bleeding where Cargo had bitten him, and he was also wet from the creek water.  Divine and another officer got appellant out of the creek, and Golez then handcuffed appellant and searched him for weapons.  Golez did not find anything related to car theft, such as shaved keys, on appellant's person.  Appellant was taken to the hospital due to the injury to his wrist.

5

Another officer found the backpack that Golez had seen, and gave it to officer Quinn.  Inside it, Quinn found a metal file; two large key rings with 15 to 20 car keys apiece, many of them shaved; and a "computer tutor" device that could be used to alter the settings on the computers of Honda vehicles.

The backpack also contained a glass pipe, three to four inches long, wrapped in a rolled up handkerchief inside a camera case.  The pipe had a bulbous end, inside which was a white crystalline residue, and burn marks on the outside of the bottom.  Quinn was familiar with this type of pipe, which in his experience was commonly used to ingest methamphetamine.  The burn marks were consistent with the pipe having been used for that purpose.  Quinn did not field test the white crystalline substance or send it to the lab in order to find out what it was.

## IV.

## DISCUSSION

### A.  Evidence Admitted Concerning Prior Crime by Appellant

Prior to trial, the prosecution moved to introduce evidence of the facts underlying appellant's 2009 conviction car theft (the prior crime evidence) under Evidence Code section 1101, subdivision (b) (section 1101(b)).  Appellant's trial counsel opposed the motion.  After considering the parties' written submissions, including an offer of proof by the prosecution, the trial court granted the motion.

Later during the prosecution's case in chief, and after appellant's objection to the prior crimes evidence was overruled, , the prosecution introduced the following evidence:

On July 20, 2009, Enrico Dalida, who lived near the Paradise Valley Golf Course, awoke to find that his 1989 Toyota Land Cruiser SUV was missing from his driveway where he had parked it the night before.  Later that morning, Fairfield police officer Jimmie Williams saw the stolen Land Cruiser parked near an apartment complex.  Appellant and another man were sitting inside the vehicle; appellant was in the driver's seat.

Williams directed appellant and the other man to put up their hands, and they did so, but then drove away.  In his effort to evade Williams's pursuit, appellant ended up

6

crashing the vehicle into the wall of a nearby parking lot. Appellant left the car and ran away into an open field, where the police caught up with him.

The police searched the Land Cruiser, and found inside it a backpack containing appellant's identification and five shaved keys, along with a file that could be used to shave keys. Appellant admitted the backpack belonged to him. There was a shaved key in the ignition of the Land Cruiser, and its steering column was undamaged.

When the police arrested appellant, he had a methamphetamine pipe in his pants pocket. It had black burn marks on it, and white crystalline residue inside, which tested positive for methamphetamine. The parties stipulated that appellant pleaded no contest to charges arising out of the incident on July 20, 2009.

With regard to the prior crime evidence, the trial court instructed the jury that if it found by a preponderance of the evidence that appellant committed the prior car theft, it could, but was not required to, "consider that evidence for the limited purpose of deciding whether or not [¶] [appellant] had a plan or scheme to commit the offense alleged in this case." The instruction continued as follows: "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime." Finally, the instruction reminded the jury that the prior crime evidence was "only one factor to consider," and was not sufficient by itself to prove that appellant was guilty.

### B. Admissibility of Prior Crime Evidence

Evidence of a criminal defendant's prior criminal activity cannot be introduced to show that the defendant has a propensity to commit crimes or a bad character. (Evid. Code, § 1101, subd. (a); *People v. Lindberg* (2008) 45 Cal.4th 1, 22 (*Lindberg*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*), superseded in part by statute on another ground as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505-506.) However, section 1101(b) permits the introduction of evidence of prior criminal acts for various purposes, including the existence of a common scheme or plan. (*Lindberg*, *supra*, 45 Cal.4th at p. 22.) Here, the trial court admitted the prior crime evidence on the basis of

7

"strong indications of common plan or scheme." We review the court's decision for abuse of discretion. (*People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 2.)

At the outset, we note that appellant's brief on appeal argues that the prior crime evidence was admitted to show identity. This mischaracterizes the record. The trial court's ruling and the jury instructions are unequivocal on this point: the prior crime evidence was admitted to show common plan or scheme, and only for that purpose. "This distinction, between the use of evidence of uncharged acts to establish the existence of a common design or plan as opposed to the use of such evidence to prove intent or identity, is subtle but significant." (*Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2.) "For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution." (*Ibid.*)

We recognize that the only disputed issue at trial was whether appellant was in fact the person who started up and then crashed the CRX. The prior crime evidence was not introduced to prove that fact, however. Rather, the prior crime evidence was introduced to show that the two crimes were committed under sufficiently similar circumstances and in a sufficiently similar manner to raise an inference that both were committed according to a common scheme or plan. Obviously, the prosecution wanted the jury to draw the further inference that appellant was the culprit in both cases; nonetheless, the evidence was not admitted to prove identity directly.

" 'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.

[Citation.]"[2] (*Lindberg*, *supra*, 45 Cal.4th at p. 22; accord, *People v. Kelly* (2007) 42 Cal.4th 763, 783 (*Kelly*).) In the present case, evidence tending to cast light on the identity of the person who crashed the CRX was obviously material, and, as already noted, proof that the theft was conducted in accordance with a common scheme or plan was probative on that issue. Thus, the first issue we must decide is whether the trial court abused its discretion in concluding that the manner and circumstances of appellant's prior car theft were sufficiently similar to the manner and circumstances of the current crime to raise an inference of common scheme or plan.

Different degrees of similarity between the prior crime and the charged one are required for admissibility, depending on the purpose for which the evidence is introduced. "When the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense with evidence he had committed uncharged offenses, the admissibility of evidence of the uncharged offenses turns on proof that the charged and uncharged offenses share sufficient distinctive common features to raise an inference of identity. A lesser degree of similarity is required to establish the existence of a common plan or scheme and still less similarity is required to establish intent. [Citations.]" (*Lindberg*, *supra*, 45 Cal.4th at p. 23, citing *Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.)

"[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Ewoldt*, *supra*, 7 Cal.4th at pp. 401-402.) "The existence of . . . a design or plan . . . may be proved circumstantially by evidence that the defendant has performed acts having 'such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]"

---

[2] Evidence Code section 352 (section 352), which gives trial courts the discretion to exclude evidence that is more prejudicial than probative, is one such "rule or policy." (See *Lindberg*, *supra*, 45 Cal.4th at pp. 22-23.) We discuss appellant's argument based on section 352 in the next section, *post*.

(*Id.* at pp. 393-394.) "[T]he plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*Id.* at p. 403.)

For example, in *People v. Shea* (1995) 39 Cal.App.4th 1257, a rape prosecution in which the defense was consent, the court upheld the admission of evidence regarding the defendant's previous rape on the ground that "the rape of [the prior victim] was sufficiently similar to the rape of the charged victim to be admissible." Sufficient similarity was found in that in both cases, "appellant was in a bar, drank with the victim, took her to a private place, violently struck her, ripped her clothes off, and raped her. In both, the victim fled, naked, to a nearby residence." (*Id.* at p. 1269.)

Here, two thefts of older model year Japanese automobiles occurred in the same neighborhood within just over two years. Both cars were crashed shortly after they were stolen—indicating, perhaps, that the thief was not a particularly adept driver. In both instances, a shaved car key was found in the stolen car, and more shaved keys, as well as a file that could be used to shave car keys, were found in a backpack at or near the scene. Both cases involved the presence of a glass pipe of the type used to ingest methamphetamine, which bore evidence of use in the form of burn marks and residue.

As appellant points out, there were factual differences between the two cases. In the earlier case, the stolen car was apparently started using a shaved key, so the steering column was not damaged; in the present case, the shaved key was sitting on the floor of the stolen car, which the thief had apparently started in a manner that involved damage to the steering column and ignition switch. In the earlier case, the crash of the stolen car resulted from an attempt to evade police pursuit; in the present case, there was no evidence regarding how or why the CRX ended up rear-ending the Accord. In the earlier case, the methamphetamine pipe was in appellant's pocket; in the present case, it was in the backpack with the shaved keys. Nonetheless, there were sufficient similarities between the two cases to create a distinct pattern. Accordingly, we are not persuaded that the trial court abused its discretion in finding that the similarities evidenced a common plan or scheme, and admitting the prior crime evidence for that purpose.

10

## C. Probative Value Weighed Against Prejudice

While evidence of uncharged offenses is admissible under the appropriate circumstances, our high court has cautioned that evidence of this kind " 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.]" (*Ewoldt*, *supra*, 7 Cal.4th at p. 404.) Thus, not only must the probative value of other crimes evidence be substantial, but that value must not be substantially outweighed by the probability that the admission of the evidence would create a serious danger of undue prejudice under section 352. (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Here, the trial court expressly found that the prior crime evidence was more probative than prejudicial within the meaning of Evidence Code section 352. Appellant challenges that conclusion. We review it for abuse of discretion. (*People v. Cox* (2003) 30 Cal.4th 916, 955, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *People v. Paniagua* (2012) 209 Cal.App.4th 499, 518.) That means reversal is not appropriate unless we are compelled to conclude that the trial court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.)

Appellant argues that the relevance of the prior crime evidence was "marginal." Like the trial court, we disagree. The prior car theft and the current one had sufficient features in common, in a sufficiently distinctive combination, to indicate the two crimes were committed in accord with a common design or plan. That, in turn, provided an additional link between appellant's presence at the scene of the charged crime, and the commission of that crime. Thus, the trial court did not abuse its discretion in finding that the prior crime evidence had significant probative value.

Nor was it severely prejudicial, in the sense in which that term is used in Evidence Code section 352. Evidence is prejudicial within the meaning of Evidence Code section 352 if it uniquely tends to evoke an emotional bias against a party as an individual, or if it would cause the jury to prejudge a person or cause on the basis of extraneous factors. (*People v. Foster* (2010) 50 Cal.4th 1301, 1331 (*Foster*); *People v. Cowan* (2010) 50

11

Cal.4th 401, 475.) Thus, in determining whether other crimes evidence is prejudicial, one factor courts look to is whether that evidence is inflammatory, i.e., whether the evidence is likely to inflame the jury's passions. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) In the present case, there was nothing inflammatory or emotionally charged about the prior crime evidence. Nor did it carry any potential to cause confusion or mislead the jury.

Moreover, a limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose. (*Foster*, *supra*, 50 Cal.4th at p. 1332 ["the jury was instructed not to consider the evidence to prove that defendant was a person of bad character, thereby 'minimizing the potential for improper use' "]; *Lindberg*, *supra*, 45 Cal.4th at pp. 25-26 [instructions eliminated any danger of confusing issues or misleading jury].) Such an instruction was given in this case, and appellant does not contend that it was incorrect, incomplete, or inadequate.

For all of the foregoing reasons, we are not persuaded that the trial court abused its discretion in determining that the probative value of the prior crime evidence outweighed its prejudicial effect. Accordingly, the admission of that evidence did not constitute reversible error.

## V.
## DISPOSITION

The judgment is affirmed.

_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.