Filed 12/9/15  P. v. Childers CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>ANTHONY CHILDERS,<br><br>    Defendant and Appellant. | F068876<br><br>(Madera Super. Ct.<br>No. MCR025353)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County. Joseph A. Soldani, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

The Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, §§ 6600 et seq.) provides for the involuntary civil commitment of an offender immediately upon release from prison, for an indeterminate term, if the offender is found to be a sexually violent predator (SVP).  In order to establish an offender is an SVP, the People must prove beyond a reasonable doubt that (1) the offender has been convicted of a sexually violent offense against one or more victims (also referred to as the qualifying conviction); (2) the person has a diagnosed mental disorder that makes the person a danger to the health and safety of others; (3) the person's disorder makes it likely he or she will engage in sexually violent criminal conduct if released; and (4) the person's sexually violent criminal conduct will be predatory in nature.  (Welf. & Inst. Code, §§ 6600, 6604; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1374; *People v. McKee* (2010) 47 Cal.4th 1172, 1187; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 52.)

Defendant/Appellant Anthony Childers was found by a jury to meet the criteria for commitment as an SVP and committed to the custody of the Department of State Hospitals for an indeterminate term.  On appeal, he contends the court violated his constitutional rights when it refused to give a special instruction, which stated the People had to prove he had "serious difficulty" controlling his behavior.  He also contends the court committed misconduct and should have granted his motion for mistrial because it asked his expert witness a hypothetical question that was not based on facts in evidence. We affirm.

## DEFENDANT'S PRIOR CONVICTIONS

We begin with the evidence about defendant's prior sexual offense convictions, which was introduced at his jury trial on the SVP petition.  As we explain below, the

2.

mental health experts discussed these convictions in reaching their opinions about whether he was an SVP.[1]

## Defendant's qualifying conviction

The first element of whether an offender is an SVP is that the People must prove the offender was convicted of "a sexually violent offense" against one or more victims, also referred to as the qualifying conviction. (Welf. & Inst. Code, § 6600.)

Defendant's qualifying conviction under the SVPA was based on his guilty plea in 1993 to a felony violation of Penal Code section 288, subdivision (a), commission of a lewd or lascivious act on a child under the age of 14 years. The victim was a seven-year-old girl identified as L.S.[2] The conviction arose from the following incident: On February 3, 1993, defendant approached L.S. and three other children, ages 7 to 11 years old, who were playing outside of an apartment in Madera. L.S. later told the police that defendant asked if they wanted to learn how to drive. The four children got into defendant's car, and he drove them to the store. The store was closed, so he drove to a Carl's Jr. restaurant and bought them food. They returned to the car, and defendant drove them around. L.S. said she had a turn driving the car.

---

[1] The SVPA provides that "[t]he details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of Hospitals." (Welf. & Inst. Code, § 6600, subd. (a)(3).) Consistent with this provision, the facts about defendant's prior convictions are from the exhibits introduced at his civil commitment trial, including court transcripts, records, and probation reports from the prior cases, the mental health experts' reports, and defendant's statements to the examining experts about his conduct.

[2] As we discuss in issue II, *post*, a felony violation of Penal Code section 288 is statutorily defined as a "sexually violent offense" under the SVPA if the victim is a child under the age of 14 years, without requiring any proof of force, violence or substantial sexual conduct. (Welf. & Inst. Code, §§ 6600, subd. (b), 6600.1; Pen. Code, § 288, subd. (a); *People v. McRoberts* (2009) 178 Cal.App.4th 1249, 1255.)

L.S. initially reported that as she sat next to defendant in the front seat, he placed his hand on her upper thigh area. L.S. later told her mother that defendant had fondled or rubbed her vaginal area.

Defendant drove the children to a park. He told L.S. and her sister that he would pay them $20 if they would look at pictures with him, referring to four pornographic magazines that were in the car. At some point, defendant exposed himself. He later admitted to the mental health examiners that he masturbated in front of the children.

Defendant kept driving around and then went to a residence. Someone at the house called the police about the children, who had been reported missing. When officers arrived, one of the children was in the car and looking through a pornographic magazine.

Defendant was arrested and charged with four counts of kidnapping and two counts of committing lewd or lascivious acts with a child under the age of 14 years.

**On-bail arrest**

Defendant was released on bail pending resolution of the kidnapping case. In March 1993, while on bail, defendant walked into a foster home where several children lived. In separate incidents, defendant exposed himself to two girls, ages 10 and 11 years old. He was arrested for this offense.

**Plea agreement for qualifying offense**

On August 5, 1993, defendant pleaded guilty to one count of commission of a lewd or lascivious act on L.S., in violation of Penal Code section 288, subdivision (a). The on-bail offense was dismissed as part of the plea agreement.

On October 6, 1993, defendant was sentenced to six years in prison for the Penal Code section 288, subdivision (a) conviction.

**Defendant's 2002 conviction**

Defendant's subsequent sexual offenses are not qualifying crimes under the SVPA, but they were relied upon by the mental health experts during their testimony about defendant's SVP classification.

On the afternoon of May 5, 2002, defendant walked up to a lemonade stand that two girls were operating in front of their house in San Bernardino. At least one adult was present. Defendant talked to the adult and asked if he could look at the fort where the children were playing. A solid wall was between defendant and the girls, and the adults. Defendant exposed and touched his penis while he was looking directly at the girls. The girls became frightened and went into the house. They watched defendant from the window. He continued to expose and touch his penis while looking at the girls. The girls told their grandmother, who called the police. When officers arrived, the adults pointed out defendant, and he ran away. After a short pursuit, the officers caught up with him. He resisted and additional officers were needed to take him into custody. Defendant said he would tell the officers whatever they wanted as long as he was only charged with a misdemeanor.

Defendant was charged with three counts of annoying or molesting a child, and resisting arrest.

On July 22, 2002, defendant pleaded guilty to a felony, annoying or molesting a child under 18 years, with a prior sexual offense conviction (Pen. Code, § 647.6, subd. (c)(2)); and misdemeanor resisting arrest.

In the probation report prepared for the 2002 case, defendant said the incident was a misunderstanding; he felt sorry for the children; and he accepted the plea because he did not want the children harassed on the witness stand.

Defendant also said "he had a 'dark cloud' over his head and no matter how hard he tries he cannot get rid of it. He states that he has something that he needs to deal with but cannot trust people. He does admit he has a problem and needs held and would do

5.

anything to get help. He also states that he does not have good control of his temper. He advised that it was hard to discuss the offense with someone that he did not know and did not want to go into detail at this time. However, he emphasized that he would like to get help."

On August 19, 2002, defendant was sentenced to four years in prison.

**Defendant's 2006 conviction**

On June 11, 2006, defendant was on parole. He went to an apartment complex on North Lake Street in Madera where his mother lived. Defendant knocked on a neighbor's door. A nine-year-old girl lived in the apartment. The girl's father answered the door. Defendant asked the father if he could use the telephone. The father left the front door open and went into the kitchen to get the telephone for defendant. The girl was sitting on a couch in the front room, about 10 feet away from defendant. Defendant remained at the front door, smiled at the girl, and unbuttoned his pants. He exposed himself and showed his private parts to the girl. He closed his pants when her father returned with the telephone. Defendant used the telephone and said his mother did not answer. He left and her father closed the door.

The girl immediately told her father what happened. Her father went outside to look for defendant. He saw defendant walking in the apartment complex. Her father tried to confront defendant, but defendant ran away. The father asked a neighbor to call the police. The father got into his car, drove after defendant, and found him three blocks away. There was a brief altercation between defendant and the father. The police responded and took defendant into custody. The officers determined defendant's pants were partially unbuttoned, and he was not wearing underwear. The girl identified defendant at an infield showup.

Defendant possessed 0.1 grams of methamphetamine. He said he was out of breath because he had just been smoking methamphetamine.

Based on this incident, defendant was charged with count I, annoying or molesting a child with a prior conviction; count II, possession of methamphetamine; count III, misdemeanor possession of narcotics paraphernalia; and count IV, misdemeanor indecent exposure with one prior strike conviction and one prior prison term enhancement.

On July 6, 2007, defendant pleaded no contest to count I, annoying or molesting a child under 18 years, with a prior sexual offense conviction (Pen. Code, § 647.6, subd. (c)(2)); and count II, possession of methamphetamine, and admitted the prior conviction allegations, for a stipulated term of six years four months.

On September 5, 2007, defendant was sentenced to the stipulated term of six years four months in prison.

**SVPA Evaluation in 2007**

In 2007, two mental health experts evaluated defendant in prison and determined he met the criteria as a SVP. Dr. Michael Selby reported:

> "[Defendant] acknowledged that when under the influence of Methamphetamine he experiences fantasies about having sex with children. …Throughout the evaluation [defendant] acknowledged that he has a problem with regard to sexual attraction to children and no ability to discontinue exposing himself to them. Many times he asked this evaluator for help, making statements such as 'help me. Please help me. I've been trying to get help and nobody will ever help me. Can you help me? Where do I sign? How do I get into a treatment program?' "

Dr. Selby also noted that defendant "acknowledged that he has strong urges to sexually molest children and that he needed treatment. His history also shows that he has a severe Methamphetamine dependency which seriously impairs his volitional control."

Dr. Bruce Yanofsky reported:

> "In discussing this [2006] offense with [defendant], he did admit readily during those moments, particularly on drugs, he does engage in fantasies involving sexual activities that include children. [Defendant] believes that in exposing himself is one of his biggest problems, but noted that he also believes his behavior could easily escalate to the point where he can sexually molest another child as he has done in the past. In discussing these matters, [defendant] was very open and frank about his difficulties

7.

handling his sexual behavior in the past and indicated he wants to receive help for his problem.”

## Petition for commitment as an SVP

On May 11, 2011, as he was nearing completion of his six-year term for the 2006 conviction, the Madera County District Attorney's office filed a petition seeking to commit defendant as an SVP for an indeterminate term, pursuant to the provisions of the SVPA.

On November 14, 2011, the court conducted a hearing and found probable cause to believe defendant was an SVP, and ordered defendant detained pending trial on the petition.

## THE JURY TRIAL ON THE SVP PETITION

On January 27, 2014, defendant's jury trial began on the SVP petition. The People called two experts, Dr. Garrett Essres and Dr. Carolyn Murphy, who testified defendant was an SVP pursuant to the statutory criteria.

## Dr. Essres's testimony

Dr. Essres, a licensed psychologist, testified defendant had a qualifying offense under the SVPA, based on his 1993 conviction for committing a lewd or lascivious act on L.S. Dr. Essres testified that one of the victims reported defendant touched her thigh and rubbed her vaginal area. Dr. Essres also testified that defendant admitted that he masturbated during this incident.

Dr. Essres testified defendant suffered from four mental disorders: pedophilic disorder, sexually attracted to females, nonexclusive; exhibitionist disorder; amphetamine use disorder; and antisocial personality disorder.

Defendant's primary diagnosis was pedophilic disorder. Defendant engaged in conduct over a 13-year period where he committed the qualifying sexual offense and repeatedly engaged in exhibitionism which resulted in additional convictions. Dr. Essres testified defendant's subsequent sexual offenses supported his opinion that defendant had pedophilic disorder because "it happened again and again. And not only did it happen

8.

again and again, it happened after some very severe sanctions." Dr. Essres particularly cited the on-bail incident in March 1993, when he went into a house and exposed himself to two girls. "Important for me … the term I use is 'perseveration,' despite the consequences, despite the cloud over his head, it couldn't and didn't stop him from doing it a month and a half later." "To have reoffended within a month and a half of that serious of a sanction speaks to volitional control."

Dr. Essres testified defendant again committed offenses after he was released from prison, when he exposed himself to the girls at the lemonade stand in 2002, and the girl in the apartment in 2006. When Dr. Essres asked defendant about these offenses, he was vague and claimed he was " 'loaded on methamphetamine' " and " '[t]he methamphetamine does that to me.' "

Dr. Essres testified that defendant told a probation officer in 2002 that he could not control his sexual and aggressive urges. In 2007, defendant told Drs. Selby and Yanofsky that he had sexual urges and fantasies involving children, and he needed and wanted treatment; he told one expert that his past behavior could escalate into child molestation if not treated. When Dr. Essres interviewed him, defendant said he really did not know why he touched children, and he did not recognize that he was driven to do it.

Dr. Essres testified defendant's four diagnosed disorders demonstrated he lacked emotional or volitional control to the degree that he constituted a menace to the health and safety of others.

> "[H]e tells others 'I've lost control of this.' He's demonstrated, by being sanctioned and doing it again, in the overall scheme of things, almost immediately, a month and a half later. Gets sanctioned; does it again. Gets sanctioned; does it again. Does not respond to sanctions.
>
> "He has demonstrated, in both words and action, a lack of control. His decision making in that regard is impair. He ties his amphetamine abuse, amphetamine disorder, to his offending. Indeed, it helps him offend; however, he does it again and again and again.

"Decision-making process – if I use this, it always goes here, and I keep doing this. And because the pedophilia is there, the amphetamine use would reduce inhibitions. Doesn't create the pedophilia. Other situations can reduce inhibitions."

While defendant's last sexual offense conviction was in 2006, Dr. Essres testified he still suffered from pedophilic disorder.

"Pedophilic disorder is an ingrained orientation, and that's essentially what I'm looking for. When you see the repeated actions, it's an orientation to sexual life. It doesn't really change. Treatment doesn't focus on changing one's pedophilic disorder. Treatment focuses on controlling the pedophilic disorder, containing the pedophilic disorder. It doesn't go away. It loses steam with age, and I've taken that into account. It loses its impetus to erupt into behavior, but it doesn't go away on its own."

Dr. Essres believed there was a substantial danger defendant would reoffend and commit a sexually violent criminal act without appropriate treatment. In reaching this conclusion, Dr. Essres relied in part on several actuarial instruments, which consistently led to his opinion that defendant met the criteria of a high-risk sex offender. Dr. Essres scored defendant as a "seven" on the Static-99, revised (Static-99R), which placed him in the high-risk category for reoffending. He concluded there was a 48 percent chance defendant would reoffend in 10 years.

Dr. Essres testified that if defendant was released into the community without treatment, there was "a serious and well-founded risk" that he would engage in sexual exhibitionism consistent with his past behavior, commit a sexually violent offense and molest a child, and engage in sexually violent predatory criminal acts. Defendant had expressed his fears he might someday lose control of his behavior and inappropriate touch a child, and that his sexual exhibitionism could eventually escalate into acts of child molestation.

"There's an out-of-control person who, if we're talking about a continuum, has made a nice start – should be proud of that. Isn't finished to contain the level of risk; that's how I see it."

Dr. Essres concluded defendant could not be safely released into the community, and an outpatient sex offender treatment program would not provide adequate treatment. He had never successfully completed a sex offender treatment program. While defendant attended mandated sex offender treatment outpatient programs on parole, these programs had not prevented him from reoffending on subsequent occasions. He had not participated or completed a substance abuse treatment program while in prison. Defendant did not have a plan to enter a sex offender treatment program after he was released from prison because "[t]he way [defendant] sees his problem is that if he doesn't use methamphetamine, he won't molest children."

> "I think methamphetamines, indeed, helps facilitate his molestation of children but it doesn't create it. And if for some reason we have a severe depression, where we can often get disorganizing thinking with it, if we get really sick, if we use some other substance – we get real drunk on New Year's Eve – a lot of other situations can lower the inhibitions for this to come out. Substance abuse treatment for stimulant use is good; not enough."

Defendant saw his methamphetamine use as an excuse, "that if it weren't for methamphetamines, he wouldn't have done it." He only had vague memories of his sexual offenses, "which may be true – amphetamine intoxication can scramble the brain pretty good. He gave me some vague explanations of the crimes, and did not know the motives. And thought they were triggered by methamphetamine. Indeed, in his mind, a series of events he could have seen it that way. But did not reveal or see anything else around that." However, defendant's use of methamphetamine was different from his desire to sexually molest children. Defendant was "not a guy who is dying to get into treatment. More of a guy who is trying to avoid commitment."

**Dr. Murphy**

Dr. Carolyn Murphy, a licensed clinical psychologist, diagnosed defendant with pedophilic disorder; exhibitionist disorder; amphetamine/stimulant use disorder; and antisocial personality disorder. She explained that pedophilia meant having a deviant

11.

interest or arousal in children but without acting on it. Pedophilic disorder was when a person acted on those deviant interests and the urge or interest is present for longer than six months, even if the person had sexual interests in adults.

Defendant's exhibitionism was solely directed toward children and tied to the pedophilic disorder. It showed "a continued interest, sexually, in children over time, despite consequences. It may not be a stand-alone qualifying diagnosis under the law. But, clinically, it informs our understanding of the pedophilic disorder, which is, and it tells us that pedophilic disorder is still likely to be present … he's not exposing himself to adult women, it's specifically children within that desired age range."

Dr. Murphy testified defendant's drug dependency disorder was severe, but there was no direct correlation between exposing oneself, being aroused by children, and amphetamine use. "[I]f you get a room full of meth users, and unless they're also a pedophile you can't say that they're likely to sexually offend against children, much less sexually offend." Defendant's qualifying sexual conviction in 1993, and his subsequent sexual offenses, showed his persistent sexual interest in children and were relevant to the diagnoses of pedophilia and exhibitionist disorder. In her report, Dr. Murphy recounted that defendant "molest[ed] at least one of the victims [during the 1993 offense] while she was sitting in his lap by fondling her vaginal area."

Dr. Murphy evaluated defendant using the Static-99R test, and his score was "five." She conducted the evaluation without knowing about his on-bail exposure arrest in March 1993. After learning about this additional incident, she raised his score to "six," which placed him at high risk to reoffend. Dr. Murphy also evaluated defendant using the revised Static-2002 test, which had slightly different variables, and his score was "eight," which was on the border of being high risk.

Dr. Murphy concluded he was in the moderate-high to high risk for reoffending, and he was likely to commit a predatory sexual offense, since all of his prior offenses were predatory and committed against victims with whom he did not have a relationship.

Defendant did not have a plan to treat his underlying pedophilic disorder or participate in sex offender treatment upon release. Instead, there was continued reliance on the explanation that methamphetamine caused the hypersexuality. A drug treatment program would only "prevent the lighting of the fuse" without dismantling his pedophilia disorder.

> "If one has no awareness of one's arousal to children, no plan to monitor or even know what your triggers, desires, high-risk factors are; and no plan or intent to go into treatment and address those things simultaneously, as in this case with drug treatment …. There's a serious concern for re-offense… [¶] … [S]ex offender treatment really helps us break down where the thinking, where the urges, where everything started, and what the person should have done a week before the offense to prevent it from having happened, to cope with their urges. Because the urges are going to remain whether or not meth is being used."

Defendant did not specifically say he did not want sexual abuse counseling, but he kept diverting the conversation to his plan to attend King of Kings outpatient drug counseling for one year and address his methamphetamine addiction. Dr. Murphy kept asking defendant about his awareness for sex offender treatment. Defendant ultimately said he would be willing to consider it, but "it took some doing to get him to even acknowledge that." Dr. Murphy testified defendant failed to verbalize awareness of his sexual desires, and instead he continued to focus on drugs instead of the pedophilia and the combination of the two disorders.

## DEFENDANT'S EXPERT

Dr. Harold Seymour, a licensed clinical psychologist, testified for defendant. Dr. Seymour believed Drs. Essres and Murphy did "an excellent job" and their reports "were quite good." He agreed with their opinions that defendant was at high risk for reoffending and he had untreated sexual urges toward children. However, he believed defendant had a chance to be successful if he was released and received the proper treatment. Dr. Seymour also believed defendant's substance abuse was "a gateway to baser instincts" and "really the consistent piece in each of the episodes," and increased his risk to reoffend.

13.

Dr. Seymour did not evaluate defendant with the same actuarial tests administered by Drs. Essres and Murphy. Instead, he evaluated defendant using a personality inventory test that objectively measured his personality function and psychopathy. It included a "coefficient of fit" mechanism to determine whether the subject's personality profile was consistent with a known disorder. He believed this test was relevant to the People's concern that defendant would not acknowledge that he had sex offense issues. Defendant's highest "coefficients of fit" were for sex offender and substance abuse.[3]

> "[H]e has a grasp on the fact that there's the sex offense-related issues, the pedophilic drives, so forth. He doesn't have a good grasp on them fully in terms of all their etiology. A lot of his concepts about it are based on some of the old way of thinking about these kinds of disorders. But he also has, I think, good insight into the fact that he has not developed skills that we'd normally expect to see in an autonomous functioning adult male. He's lacking in those, and he really needs to learn those skills in order to be able to function."

Dr. Seymour diagnosed defendant with pedophilia, exhibitionism, depressive disorder, and methamphetamine dependence. He disagreed with the diagnosis of antisocial personality disorder, and believed defendant had a personality disorder with borderline and dependent features.

Dr. Seymour testified defendant had arranged for his acceptance into the King of Kings residential drug treatment program. Dr. Seymour believed that program was very good for drug treatment. It did not offer sex abuse counseling, but it could get him into the correct program. Dr. Seymour conceded defendant could "walk away" from the King of Kings program at any time.[4]

---

[3] Dr. Murphy testified Dr. Seymour evaluated defendant using the Personality Assessment Inventory Test, which was a standard way to evaluate an individual's personality functioning and emotional stability. She had never seen the test used in SVP evaluations since it did not assist in diagnosing a qualifying disorder.

[4] In issue II, *post*, we extensively review Dr. Seymour's testimony about the SVPA's legal definitions, which led the court to ask a hypothetical question about defendant's status as an SVP.

**Don Walker**

Don Walker, a certified substance abuse counselor at King of Kings Recovery Home, testified his agency provided substance abuse counseling, drug education, and referrals for clients to obtain needed counseling from outside agencies.

Walker assessed defendant and determined that substance abuse treatment was necessary because of his methamphetamine addiction, and he was a suitable candidate for the program. It was a residential treatment program and defendant could leave at any time, but the agency would immediately notify probation or parole if he did.

## DEFENDANT'S TESTIMONY

Defendant agreed with the opinions from the People's experts that he had pedophilia disorder, exhibitionist disorder, and drug dependency disorder.

Defendant used methamphetamine every day before he was sent to prison. Defendant acknowledged he suffered legal consequences because of his methamphetamine use, but it had not been enough "to get me to stop .… At least not until this time." Defendant had never been in any drug treatment program. He was able to use drugs when he was initially in prison, but then he made the decision to stop and had not used drugs for seven years.

Defendant testified he committed sex crimes only when he was under the influence of methamphetamine. His "first known" sex crime was on February 3, 1983, when he picked up the four children in his car. Defendant testified he did not remember much about the incident because he was "very high." He only remembered "[w]hatever I told them. As far as even on the masturbation, I don't really know for sure. And I told [the expert] that before, 'If they said I did, then I did. But I'm not sure I did or I didn't.' And I've said that every interview."

Defendant knew that he was driving his grandmother's "old four-door" car, and the four children were younger than 10 years old. Defendant testified he knew the older boy, and he drove the children to a Carl's Jr. restaurant and bought them food. He was

15.

too high to eat. He watched the children as they played at the restaurant. One of the boys found pornographic magazines which were under the car seat. He could not remember if he taught the children how to drive.

> "Q. [S]o you don't remember anything about whether or not you touched the girls?
>
> "A. I don't recall ever touching any type sexual parts. No, I don't recall that.
>
> "Q. And you don't recall—your testimony is you don't recall exposing your genitals to the girls?
>
> "A. That could be a possibility. I told Dr. Seymour that is very possible, because that is kind of what I do. I mean, it happens. And the reason why I say it, because it's happened over and over. So it's quite possible that I have exposed myself."

Defendant testified he was high when he went into a foster home in March 1993 and exposed himself to two girls. "I'm always high if I do any of these crimes, constantly," and it was "hard to make sense of total chaos."

Defendant testified he was released on parole on November 30, 1997, and he started using methamphetamine again. In October 1998, he violated parole and was convicted for being under the influence of methamphetamine. He had two other parole violations. He was discharged from parole in November 2001. He tried to avoid using methamphetamine, he briefly succeeded, and he started using again.

Defendant admitted he committed the exposure offense at the lemonade stand in 2002, just six months after he was discharged from parole. He was high on methamphetamine, and he again said he could not "make sense of total chaos." He was sentenced to prison and released on parole on December 7, 2005.

Defendant testified his next sex offense occurred in 2006, at the apartment complex where his mother lived, when he exposed himself to the girl in the neighbor's apartment. Defendant again testified he was on methamphetamine and did not know what he was thinking when he committed the offense.

16.

Defendant admitted that he told the mental health experts in 2007 that he had impure thoughts about children.

> "Q.    Isn't it true – so feeling bad about your crimes hasn't prevented you from doing them whenever you've been out, right?

> "A.    It hasn't prevented me from using methamphetamine, which does induce whatever problem I do have – and which I do admit I have a problem.  Psychologically, it's embedded somewhere in my head.  Now, off methamphetamine, like I started before, the problems I do have are controlled and managed.  But on methamphetamine I cannot control them.  It may or may not happen.  I'm not saying it will happen every time, because they haven't.  [¶]  That's the thing, when I start to use meth again, it's—how many times have I used meth and this has not happened?  Well, many.  And that's the thing being dependent on meth, it starts laying that trick on you, in a sense.  You've used many times before and this has never happened, so it may not happen again.  But unfortunately – and that's what's helped me stay clean in the last seven and half years is I tell myself if I use, this will happen.

> "Q.    So do you agree with the diagnosis of pedophilia?

> "A.    I agree I do have a problem, yes, absolutely.  And I agree it is pedophilia, whatever it may be.  However they diagnosed it.  I agree with the diagnosis, let me put it to you that way.  I know I have a problem.  It's how to fix, how to understand it has been a lot of problem."

Defendant never committed sex offenses when he was off drugs, and "it started when I was on drugs, so I associated it to the meth."  "Now, off drugs I do not act like this or conduct myself in any sexual or criminal manner.  Only time I've ever had any problem with law enforcement, period, has been under the influence."  His sobriety while in prison "helped me see that meth isn't the problem," that he had other issues, and "I can control my problems."

Defendant acknowledged he needed both drug and sex offender treatment.  He was not able to participate in any program in prison because he was in solitary confinement for the past two and a half years.[5]  During his prior prison terms, he was

---

[5] According to the experts' reports, defendant was placed in solitary confinement because of his classification as a sex offender rather than behavioral issues.

excluded from the programs because of the nature of his conviction. He never sought or obtained sex offender treatment in prison because he did not want to risk his safety by disclosing the nature of his convictions to other inmates.

In anticipation of his release, defendant had been accepted into the King of Kings outpatient drug treatment program, but he had not looked into any sex offender programs. He knew that "both issues need to be addressed, the meth as well as the psychological issues, simultaneously need to be treated. I believe once that is done, I'll be able to conduct myself properly in society and be productive."

**Verdict and commitment**

On January 31, 2014, the jury found defendant met the criteria for commitment as an SVP. The court ordered defendant committed to the custody of the Department of State Hospitals, Coalinga State Hospital, for an indeterminate term.

**DISCUSSION**

**I. Defendant's Special Instruction**

Defendant contends the court violated his constitutional rights to due process, a jury trial, and a fair trial when it denied his request for a special instruction that the People had to prove the diagnosed mental disorder caused him "serious difficulty in controlling his sexually violent behavior." Defendant argues the instruction was required based on the analysis in *Kansas v. Crane* (2002) 534 U.S. 407 (*Crane*), as to the constitutional protections when an offender is alleged to be an SVP.

In order to address this issue, we turn to the legal basis for defendant's instructional request. As we explain, the court properly denied defendant's request because the pattern instruction adequately set forth the principle addressed in *Crane*.

**A. *Crane* and *Williams***

An SVP is statutorily defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or

18.

she will engaged in sexually violent criminal behavior." (Welf. & Inst. Code, § 6600, subd. (a)(1).) A "diagnosed mental disorder" includes "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (Welf. & Inst. Code, § 6600, subd. (c)(1).) "Likely" in this context means the person charged as an SVP presents "a substantial danger, that is, a serious and well-founded risk, of committing a sexually violent predatory crime if released from custody." (*People v. Roberge* (2003) 29 Cal.4th 979, 988.)

In *Crane*, *supra*, 534 U.S. 407, the United States Supreme Court held the federal Constitution requires a distinction to be drawn between a dangerous sexual offender subject to civil commitment, and other criminals dealt with in criminal proceedings. *Crane* held that to warrant civil commitment, the offender must manifest "a special and serious lack of ability to control behavior." (*Id*. at pp. 412–413.) *Crane* further held that the offender's " 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that *there must be proof of serious difficulty in controlling behavior*. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. [Citations.]" (*Id*. at p. 413, italics added.)

In *People v. Williams* (2003) 31 Cal.4th 757 (*Williams*), the California Supreme Court acknowledged the SVPA did not use *Crane's* "precise language" in defining who is eligible for involuntary civil commitment as an SVP. (*Id*. at p. 759.) *Williams* considered whether special instructions were needed to address the issue of " 'serious difficulty' in controlling behavior" discussed in *Crane*. (*Ibid*.) *Williams* held that a special instruction was not constitutionally necessary under *Crane* because the

19.

definitional language of Welfare and Institutions Code section 6600, subdivisions (a)(1) and (c), taken together, "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior. The SVPA's plain words thus suffice 'to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.' [Citation.]" (*Id*. at pp. 759–760.)

*Williams* emphasized the definitional words in the SVPA "*inherently and adequately convey* the crucial class-restricting elements of future dangerousness linked to a disorder-related inability to control behavior. It necessarily follows that, if supported by substantial evidence, any finding of eligibility for commitment under these statutes, when made pursuant to *the statutory language itself,* also meets constitutional standards." (*Williams*, *supra*, 31 Cal.4th at p. 769, italics in original.)

> "California's statute inherently *embraces and conveys* the need for a dangerous mental condition characterized by impairment of behavioral control. [T]he SVPA accomplishes this purpose by defining a sexually violent predator to include the requirement of a diagnosed mental disorder [citation] affecting the emotional or volitional capacity [citation], which predisposes one to commit criminal sexual acts so as to render the person a menace to the health and safety of others [citation], such that the person is 'likely [to] engage in sexually violent criminal behavior' [citation]. [Citation.]" (*Id*. at pp. 774.)

*Williams* concluded that *Crane* "does not compel us to hold that further lack-of-control instructions or findings are necessary to support a commitment under the SVPA." (*Williams*, *supra*, 31 Cal.4th at pp. 774–775.) "We are persuaded that a jury instructed in the language of California's statute must necessarily understand the need for serious difficulty in controlling behavior." (*Id*. at p. 774.) Thus, "a commitment rendered under the plain language of the SVPA necessarily encompasses a determination of serious difficulty in controlling one's criminal sexual violence, as required by [*Crane*]. Accordingly, separate instructions or findings on that issue are not constitutionally

20.

required, and no error arose from the court's failure to give such instructions in defendant's trial." (*Id*. at p. 777.)

## B.  The Instructions

In this case, the court instructed the jury with CALCRIM No. 3454, as to the People's burden to prove defendant was an SVP.  As in *Williams*, the pattern instruction followed the statutory definitions of the SVPA in Welfare and Institutions Code section 6600, et seq.

> "The petition alleges that Anthony Childers is a sexually violent predator.  To prove this allegation, the People must prove beyond a reasonable doubt that:
>
> "One, he has been convicted of a—has been convicted of committing sexually violent offenses against one or more victims; two, he has a diagnosed mental disorder; three, as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; and four, it is necessary to keep him in custody in a secure facility to ensure the health and safety of others.
>
> "The term 'diagnosed mental disorder' includes conditions either existing at birth or acquired after birth *that affect a person's ability to control emotions and behavior* and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others."
>
> "A person is likely to engage in sexually violent predatory criminal behavior *if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released into the community*.
>
> "The likelihood that the person will engage in such conduct does not have to be greater than 50 percent.  Sexually violent criminal behavior is predatory if it is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or a person with whom a relationship has been established or promoted for the primary purpose of victimization.
>
> "A violation of Penal Code Section 288 (a) is a sexually violent offense when the offense is committed on a child under 14 years old.

21.

"As used here, a conviction for committing a sexually violent offense is one of the following: A prior conviction for the above offense I have just described to you that resulted in a prison sentence for a fixed period of time. You may not conclude that Anthony Childers is a sexually violent predator based solely on his alleged prior convictions without additional evidence that he currently has such a diagnosed mental disorder. In order to prove that Anthony Childers is a danger to the health and safety of others, the People do not need to prove a recent overt act committed while he was in custody. A recent overt act is a criminal act that shows a likelihood that the actor may engage in sexually violent predatory criminal behavior." (Italics added.)

Defendant did not object to CALCRIM No. 3454. Instead, he moved for the court to give the following special instruction using *Crane's* language, and argued it was required by the United States Supreme Court to protect his due process rights.

"In order to find that [defendant] meets the criteria of having the requisite diagnosed mental disorder, [defendant] must prove that *such disorder causes [defendant] serious difficulty in controlling his sexually violent behavior*." (Italics added.)

In moving for this special instruction, defendant acknowledged that *Williams* held such language was not necessary, but argued the instruction was not prejudicial and would ensure the jury fully understood the applicable legal basis for finding defendant was an SVP. The prosecutor objected to the special instruction. The court took the matter under submission. It did not give the instruction and did not make any comments about denying defendant's motion.

## C. **Analysis**

Defendant contends the court prejudicially erred when it denied his motion to give his special instruction consistent with *Crane*. Defendant acknowledges this issue was decided against him in *Williams,* but raises the issue "to preserve it for possible federal review" and urges this court to find that *Williams* "was wrongly decided."

As defendant acknowledges, *Williams* is dispositive of his claim of instructional error. The jury herein received CALCRIM NO. 3454, which correctly states the statutory definitions from the SVPA. *Williams* held that identical language was sufficient to

22.

convey the constitutional concerns addressed in *Crane*. (See, e.g., *People v. Paniagua* (2012) 209 Cal.App.4th 499, 526–528 (*Paniagua*).) "The Supreme Court has never repudiated this view, which alone makes it dispositive. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455[].)" (*Id.* at p. 528.) We are bound to follow *Williams* and decline to find it was wrongly decided.

Defendant cites *In re Howard N.* (2005) 35 Cal.4th 117 (*Howard N.*) and *People v. Galindo* (2006) 142 Cal.App.4th 531 (*Galindo*), in support of his argument that *Williams* was wrongly decided and that the pattern instruction on the SVPA's statutory definitions failed to convey *Crane's* "serious difficulty" requirement. *Paniagua* rejected a similar argument and explained that *Howard N.* and *Galindo* "held that the statutory language of *other* civil commitment schemes … did not contain the constitutionally necessary requirement of volitional impairment as was included in the SVPA. [Citations.] Indeed, the *Howard N.* court reaffirmed the holding in [*Williams*] – that jury instructions including the statutory language of the SVPA adequately conveyed the requisite requirement of serious difficulty controlling behavior. [Citation.]" (*Paniagua*, *supra*, 209 Cal.App.4th at p. 528, italics in original.)

Since the SVPA adequately conveys the crucial elements necessary to find that a person is an SVP, and the standard CALJIC instruction adequately communicates the statutory requirements, we find the court did not abuse its discretion or violate defendant's constitutional rights when it denied his instructional request. While defendant's proposed instruction correctly stated the holding of *Crane*, the principle it conveyed was duplicative of CALCRIM No. 3454. Accordingly, it was properly refused as a pinpoint instruction. (*Williams*, *supra*, 31 Cal.4th at p. 777; *People v. Gurule* (2002) 28 Cal.4th 557, 659–660.)

## II. The Court's Question for Dr. Seymour

Defendant next contends the court committed prejudicial error when it asked Dr. Seymour, his mental health expert, a hypothetical question based on his 1993 qualifying

sexual offense. Defendant asserts the court's question to his expert was based on facts not in evidence and prejudiced the jury about the underlying nature of the 1993 conviction.

Defendant's contentions about the court's question must be considered in the context of the entirety of Dr. Seymour's testimony.

### A. **Dr. Seymour's Testimony**

In the course of his direct examination, Dr. Seymour testified defendant's case was "unique" and placed him outside the SVPA's statutory definitions:

> "[T]here's the issue of the sexual acting out which he … acknowledges. But the issue of violence is – is unique and it's because it's defined by statute, not by action; which means that the age of the girls who he exposed himself to, by California law, caused that to be a violent crime, but historically—"

The district attorney objected for a misstatement of law, and the court granted her motion to strike.

Defendant's counsel asked Dr. Seymour why his case was unique. Dr. Seymour replied defendant's history did not reflect "at least in terms of any information I have— actual interpersonal violence by [defendant]." Dr. Seymour described the SVP designation as "a legal artifact" because defendant "hadn't committed actual physical violence. It's the way the statute is written, but not that it means that he actually committed real violence." Dr. Seymour did not consider defendant to be a dangerous pedophile because he never engaged in direct predatory behavior and his prior acts were impulsive and not planned. Dr. Seymour was cognizant of the need to protect society but also believed there was a need for common sense in this case.

> "[M]y issue was the absence of actual interpersonal violence in his history; that he is acknowledging his need for treatment; acknowledges that there's issues he needs to work through. And for those reasons, I felt that this is something that was reasonable to have people consider."

24.

On cross-examination, the district attorney asked Dr. Seymour to clarify his knowledge of the SVPA's statutory definitions. Dr. Seymour replied he was not a lawyer.

"Q. And so what is the definition of predatory?

"A. You want me to read the definition. Sure.

"Q. Yes.

"A. 'Predatory means an act is directed towards a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization.'

"Q. Now, the first section there is actions directed towards strangers, correct?

"A. Yes.

"Q. And from what you know of [defendant's], all of his sex crimes, they're all directed towards strangers, correct?

"A. Correct.

"Q. So doesn't that meet the definition of 'predatory'?

"A. *It depends on how you parse the language. An act directed toward a stranger, is a pretty narrow range in terms of stuff. The quibble I have is 'directed' sounds like you've picked somebody and you're going to that person to do that, and that's how I interpret that. That may not be – that's why I say I'm not a lawyer – that may not be an accurate reading of that, but that's how I read that.*

"Q. Okay. How do you interpret – what's your definition of directed?

"A. Directed is when somebody actively selects a target, moves toward that target, okay, and acts out on the target.

"[¶] … [¶]

"Q. And it seems from your testimony regarding what the word 'violent' means, the legal definition of 'violent' is acts – is different than what your common knowledge is, or assumption of violation is, correct?

25.

"A.   Correct.

"Q.   But here we're dealing with what the legal definition is, aren't we?

"A.   Yes.

"Q.   So based on the legal definition, his acts are violent, aren't there [*sic*]?

"A.   Based on the statute, yes."  (Italics added.)

On further examination, defendant's counsel asked Dr. Seymour about the SVPA's other statutory terms:

"Q.   … According to the law, predator, in this kind of case, is defined in a certain way?

"A.   Correct.

"Q.   *However you see predatory acts in a more common way, like the use of violence would be understood in a common way, correct*?

"A.   *Yes.*"  (Italics added.)

## B. The Court's Question

After this sequence, the court asked the parties whether they had further questions for Dr. Seymour.  Both parties said no.  The court then asked Dr. Seymour a question:

"THE COURT:   Let me ask you a question *about the predatory acts*. [¶]  If an individual, hypothetically, would gather a number of young children, say 7 to 10, and encouraged them to get in the car with him and take the children someplace.  And in that process allows *at least one of the children*, which is a girl, or maybe two to sit on his lap.  And while doing that he touches their vagina, is that a predatory act?

"[Dr. Seymour]:   Um, if engaged in the physical touch of the genitals, yes.  I would consider that a predatory act.

"THE COURT:  Under your definition and certainly under the law; is that correct?

"[Dr. Seymour]:   Yes."  (Italics added.)

Defense counsel did not object. The court excused the jury and asked the parties if there were any additional issues. The parties said no. Later that day, the parties rested, the court instructed the jury, and the court adjourned for the evening.

## C. <u>Motion for Mistrial</u>

On the following day, as the court convened for the closing arguments, defendant moved for a mistrial based on the court's question to Dr. Seymour.

> "You asked my expert, Dr. Seymour, a question about predatory acts. And you stated a hypothetical where he lured kids into the car and touched one of them in the vaginal area. *As far as I was concerned, that was a contested issue I was going to argue during my closing argument.* And I'm afraid that your question put a suggestion in the minds of the jury that that was your position, and I believe that has a poisonous effect on the jury. And I feel I should make a motion for mistrial. Thank you." (Italics added.)

The prosecutor objected:

> "My understanding is the Court can ask questions of witnesses. I didn't think the hypothetical was inappropriate. And that we're not here to contest facts, the facts are already what they are. And that case has been resolved many years ago, and we're not here about that. We're here for one reason, to see if he needs to be committed as an SVP. And I don't think the jury is tainted in any way."

The court denied defendant's motion for mistrial:

> "I think there's an instruction to the jury that tells them the opinion of the experts is based on facts, and it talks about hypothetical[s]. And if they find the facts used [in] those hypotheticals do not exist, then the opinion of the expert is not relevant as to those facts. So I think the jury can still look at that and determine whether or not those facts are facts that occurred.

> "And if they find they did not occur, then the doctor's opinion is not relevant. If they find that they did occur, then of course, they may give it whatever weight they think is appropriate. So that's why the jury does; they determine what hypotheticals have been supported by the facts and which ones haven't. And you can certainly argue that to the jury. So I'm going to deny your motion."

**D. Defendant's Claim of Error**

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citations.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1038; *People v. Lucero* (2000) 23 Cal.4th 692, 713–714.)

Defendant argues the court's hypothetical question was prejudicial because it was based on facts not in evidence about his 1993 prior conviction, arising from the incident when he lured the four children into his car. Defendant argues "the only evidence" that he touched L.S.'s vagina was based on a report from L.S.'s mother that L.S. "told her" that defendant touched "her private part." Defendant cites his own hearing testimony that he did not recall "ever touching any type [of] sexual parts," and argues the court's hypothetical question was not based on any admissible evidence that he sexually touched L.S. He further argues:

> "Although [defendant] had been convicted of violating Penal Code section 288, subdivision (a), there is no evidence that the conviction was based on a touching of the victim's vaginal area, as opposed to other conduct constituting a violation of the statute. *And, the purported touching of the victim's upper thigh may not have been a sexual touching*…. Nor was there any evidence that [defendant] had ever touched a second child in a sexual manner, as the trial court suggested. Given the dearth of evidence that [defendant] had ever actually touched a child sexually, much less two, as the trial court's question intimated, but for the trial court's suggestive question the jury could have readily determined that he was not a sexually violent predator." (Italics added.)

**E. The Court's Discretion to Ask Questions**

There are several problems with defendant's contentions.[6] First, we first note that the trial court "has both the discretion and the duty to ask questions of witnesses,

---

[6] The People assert that defendant waived any error because he failed to immediately object when the court posed the hypothetical question to Dr. Seymour. However, defendant's counsel made the motion for mistrial the following day, prior to

provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony. [Citations.] The court may not, however, assume the role of either the prosecution or of the defense. [Citation.] The court's questioning must be ' "temperate, nonargumentative, and scrupulously fair" ' [citation], and it must not convey to the jury the court's opinion of the witness's credibility. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 597.) "[T]he court may not express its views on the ultimate issue of guilt or innocence or otherwise 'usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses.' [Citation.]" (*People v. Melton*, *supra*, 44 Cal.3d at p. 735; *People v. Sanders* (1995) 11 Cal.4th 475, 531.) "We 'evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.' [Citation.]" (*People v. Sanders*, *supra*, 11 Cal.4th at pp. 531–532.)

It is important to note the circumstances under which the court asked Dr. Seymour the hypothetical question. Dr. Seymour disputed the statutory definitions in the SVPA related to dangerousness. On cross-examination, the district attorney asked Dr. Seymour to review the SVPA's statutory definitions of the relevant terms, and Dr. Seymour conceded that, "[b]ased on the statute," defendant's qualifying sexual offenses were violent. However, Dr. Seymour also testified the classification of defendant as an SVP was "a legal artifact" because defendant "hadn't committed actual physical violence. It's the way the statute is written, but not that it means that he actually committed real violence." Dr. Seymour also testified he viewed the phrase "predatory acts" in a "more common way."

In this context, the court did not abuse its discretion when it sought to clarify Dr. Seymour's confusing testimony about whether he disputed the 1993 conviction was a qualifying offense under the SVPA, if he was confused about the SVPA's statutory

_____

closing arguments, and the court had the opportunity to cure any alleged error. There is no reason to hold the issue was waived. (*People v. Melton* (1988) 44 Cal.3d 713, 735.)

29.

definitions, or if he disagreed and disputed those statutory definitions. The court's efforts to clarify the expert's testimony were not inappropriate or prejudicial under these circumstances. (*People v. Sanders*, *supra*, 11 Cal.4th at p. 531.)

## F.  Defendant's Prior Qualifying Conviction

Next, defendant asserts the court's question was prejudicial because it misstated the underlying facts of his 1993 conviction, and prevented the jury from determining whether or not it was a qualifying prior conviction under the SVPA.

As explained above, one of the elements the People must prove beyond a reasonable doubt to establish an offender is an SVP is that he or she has been convicted of a sexually violent offense against one or more victims, also referred to as the qualifying conviction. (Welf. & Inst. Code, §§ 6600, 6604; *People v. McDonald*, *supra*, 214 Cal.App.4th at p. 1374.) Also as explained above, a felony violation of Penal Code section 288 is statutorily defined as a "sexually violent offense" under the SVPA if the victim is a child under the age of 14 years, without requiring any further evidence of force, violence or substantial sexual conduct. (Welf. & Inst. Code, §§ 6600, subd. (b), 6600.1; Pen. Code, § 288, subd. (a); *People v. McRoberts*, *supra*, 178 Cal.App.4th at p. 1255.)

Defendant pleaded guilty to a felony violation of Penal Code section 288, subdivision (a), commission of a lewd or lascivious act on seven-year-old L.S. Thus, his 1993 conviction was a qualifying offense within the meaning of the SVPA regardless of the underlying facts and circumstances.

Nevertheless, on appeal, as at trial, defendant seeks to relitigate this conviction. He argues there is no evidence he touched L.S.'s vagina. Defendant asserts the court relied on facts not in evidence when it posed the hypothetical question to Dr. Seymour based on this claim, and the assertion that more than one child was victimized during the 1993 incident.

Section 288, subdivision (a) "is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child…." (*People v. Martinez* (1995) 11 Cal.4th 434, 452.) "[T]hat sexual gratification must be presently intended at the time such 'touching' occurs. [Citations.]" (*Id.* at p. 444.) "[A] lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body. [Citations.]" (*Ibid.*) The circumstances of the touching are highly relevant to determine if it was performed with the required specific intent. In making that determination, all the circumstances must be considered, including the manner of touching, other acts of lewd conduct admitted or charged in the case, the relationship of the parties, and any coercion or bribery used to obtain the victim's cooperation. (*Id.* at pp. 445, 452.)

While there was no sworn testimony about the offense, the SVPA provides for the review of documentary evidence, including but not limited to "preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of Hospitals," to determine the underlying details of the offender's prior conviction. (Welf. & Inst. Code, § 6600, subd. (a)(3).) According to the probation report for the 1993 offense, L.S. initially said that as she sat next to defendant in the front seat of the car, he placed his hand on her upper thigh area. L.S. later told her mother that defendant fondled or rubbed her vaginal area. In his hearing testimony, Dr. Essres cited these statements when he discussed the 1993 incident. Dr. Essres also testified that he asked defendant about the 1993 incident, and defendant admitted he masturbated in front of the children. In her report for the SVP proceedings, Dr. Murphy stated that defendant molested "at least one of the victims while she was sitting in his lap by fondling her vaginal area."

Defendant pleaded guilty to a felony that is statutorily defined as a qualifying offense under the SVPA. In doing so, he necessarily admitted that he touched L.S.'s body with the requisite sexual intent, as required for a violation of Penal Code section

31.

288, subdivision (a). While defendant testified at the hearing that he did not sexually touch any of the children during the 1993 incident, the court's hypothetical question to Dr. Seymour was based on documentary evidence in the record, and did not rely on facts not in evidence. There was also evidence that more than one child was victimized because defendant showed pornographic magazines to one or more of the children, he exposed himself, and he masturbated during the incident.

### G. **Instructions**

Finally, we find the court's instructions to the jury adequately addressed any possible issues about expert testimony, hypothetical questions, and the court's question. The court instructed the jury with CALCRIM No. 332 on expert testimony.

> "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. *You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence*.

> "An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. *It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion*.

> "If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications." (Italics added.)

32.

The jury also received CALCRIM No. 3550, where the court admonished not to "take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be."

We conclude the court properly denied defendant's motion for mistrial, the court's question was appropriate based on Dr. Seymour's testimony, the question was not based on evidence outside the record, and the jury was correctly instructed on evaluating hypothetical questions.

## DISPOSITION

The judgment is affirmed.

_____

POOCHIGIAN, J.

WE CONCUR:

_____

KANE, Acting P.J.

_____

FRANSON, J.

33.